**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| IN RE THE HAIN CELESTIAL GROUP, INC. STOCKHOLDER CLASS AND DERIVATIVE LITIGATION<br><br>[This file relates to Case No. 17-cv-3119, which was consolidated into Lead Case No. 17-cv-2351] | : : : : : : : : : : : | Lead Case No. 17-cv-2351-ADS-AYS<br><br>(Consolidated Case)<br><br><u>DEMAND FOR JURY TRIAL</u> |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>
<u>**[REDACTED]**</u>

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 23 2017 ★

BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

GARY MERENSTEIN, derivatively on behalf of THE HAIN CELESTIAL GROUP, INC.,

Plaintiff,

v.

ANDREW R. HEYER, ADRIANNE SHAPIRA, IRWIN D. SIMON, LAWRENCE S. ZILAVY, RICHARD C. BERKE, SCOTT M. O'NEIL, RAYMOND W. KELLY, ROGER MELTZER, AND PASQUALE ("PAT") CONTE,

Defendants,

and

THE HAIN CELESTIAL GROUP, INC.,

Nominal Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO. _____

**CV 17 - 3119**

DEMAND FOR JURY TRIAL

**AZRACK, J.**

**SHIELDS, M.J.**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

# TABLE OF CONTENTS

Page

A.  INTRODUCTION .................................................................................................1

B.  JURISDICTION AND VENUE .............................................................................4

C.  RELEVANT PERIOD ...........................................................................................5

D.  PARTIES ...............................................................................................................5

E.  RELEVANT DUTIES AND CORPORATE GOVERNANCE OBLIGATIONS ..............12

   1.  Individual Defendants' Duties and Obligations..........................................12

   2.  Duties of the Audit Committee Members ...................................................14

   3.  Duties of the Compensation Committee Members......................................15

   4.  Hain's Corporate Governance Guidelines ..................................................16

   5.  Hain's Code of Business Conduct and Ethics.............................................17

F.  FACTUAL ALLEGATIONS CONCERNING HAIN'S MISREPORTING OF ITS FINANCIAL RESULTS .....................................................................19

   1.  The Company and Its Founder....................................................................19

   2.  Relevant Accounting Principles..................................................................21

   3.  The Company's Misreporting of Its Financial Results ...............................23

      a.  First Quarter of 2016 Financial Results ...........................................23

      b.  Second Quarter of 2016 Financial Results........................................25

      c.  Third Quarter of 2016 Financial Results ..........................................28

   4.  The Truth Emerges and Hain's Stock Price Plummets in Response ...........30

   5.  The Aftermath of Hain's Misreporting Disclosures ...................................31

      a.  Analysts Downgrade Hain Stock and Express Concern Over the Company's Failure to File Its Financial Results .......................................................31

      b.  First Late Filing and Its Consequences.............................................32

| | | i. | First Late Filing Notice | 32 |
| | | ii. | Notice of Non-Compliance Related to Delayed Filing of the 2016 10-K | 33 |
| | | iii. | First Limited Waiver and Extension of Hain's Credit Agreement | 33 |
| | | iv. | November 3, 2016 Press Release | 34 |
| | c. | | Second Late Filing and Its Consequences | 34 |
| | | i. | Second Late Filing Notice | 34 |
| | | ii. | November 16, 2016 Press Release | 35 |
| | | iii. | Second Limited Waiver and Extension to Hain's Credit Agreement | 37 |
| | d. | | Third Late Filing and Its Consequences | 37 |
| | | i. | Third Late Filing Notice | 37 |
| | | ii. | Analysts Believe the Revenue Recognition Problems are More Widespread than Previously Reported by the Company | 39 |
| | | iii. | Notice of Delisting or Failure to Satisfy a Continued Listing Rule | 40 |
| | | iv. | Third Limited Waiver and Extension to Hain's Credit Agreement | 41 |
| | | v. | Notice of Non-Compliance Related to Delayed Filing of the 2016 10-K and First and Second Quarter 2017 10-Qs | 41 |
| | e. | | Fourth Late Filing Notice | 42 |
| G. | | | DEFENDANTS VIOLATE THEIR OWN BY-LAWS AND DELAWARE LAW BY FAILING TO HOLD ANNUAL STOCKHOLDERS MEETING | 44 |
| H. | | | FACTUAL ALLEGATIONS CONCERNING CORPORATE WASTE AND UNJUST ENRICHMENT | 46 |
| | 1. | | Defendant Simon's Recent Executive Compensation | 46 |
| | 2. | | The Board's Approval of Defendant Simon's Exorbitant Executive Compensation Was Based on Skewed Data that Directors Knew Was Inaccurate | 47 |
| | 3. | | Defendant Simon Was Incentivized to Overstate the Company's Revenue So that He Could Receive Millions in Bonuses | 55 |
| | 4. | | Hain's Shareholders Have Tried Futilely for Years to Rein in Executive Compensation, but to No Avail | 64 |

      5.     2015 Proxy Statement Is False and Violates §14(a) of the Exchange Act ..................69

I.     DAMAGES TO HAIN ........................................................................................................72

J.     DERIVATIVE AND DEMAND ALLEGATIONS ..............................................................73

K.     PRAYER FOR RELIEF ...................................................................................................88

Plaintiff Gary Merenstein ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant, The Hain Celestial Group, Inc. ("Hain" or the "Company"), submits this Shareholder Derivative Complaint against Defendants Andrew R. Heyer, Adrianne Shapira, Irwin D. Simon, Lawrence S. Zilavy, Richard C. Berke, Scott M. O'Neil, Raymond W. Kelly, Roger Meltzer, and Pasquale ("Pat") Conte (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Hain, waste and unjust enrichment, and violations of §§14(a) and 29(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78n(a) and 78cc(b)). Plaintiff's allegations are based upon Plaintiff's personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of internal business records obtained from Hain pursuant to 8 *Del. C.* §220, as well as a review of publicly available information, including filings by Hain with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, filings in lawsuits, and matters of public record.

## A.    INTRODUCTION

1.    This is a shareholder derivative action arising from Defendants' breaches of their fiduciary duties of loyalty and good faith, and violations of §§14(a) and 29(b) of the Securities Exchange Act of 1934 brought on behalf of the Company against all eight members of the Company's Board of Directors ("Board") and the Company's Chief Financial Officer ("CFO"). The entire Board is disabled from responding to a litigation demand by a Hain shareholder.

2.    Hain is a New York-based company that markets, manufactures, and sells numerous organic and natural food and health products. Almost all of Hain's sales are made by or through its network of distributors. These distributors are critical to the Company's bottom line – one distributor accounted for approximately 12% of the Company's net sales for 2015 –

and the Company offers them various "concessions" (*i.e.*, promotions and discounts) to incentivize more sales.

3. Beginning in November 5, 2015, the members of the Board and Defendant Conte (the Company's CFO) continually misrepresented the Company's revenue in its financial statements, by failing to properly account for the above-mentioned concessions to distributors at the time the sales were recognized. Relatedly, the Individual Defendants misrepresented the adequacy of the Company's internal controls to assure that Hain's financial statements were reliable and free of material misstatements. These representations misled investors into believing that the Company was growing faster and was more profitable than it actually was.

4. While profitability is a concern for all companies, Defendant Simon was particularly motivated to boost the Company's revenue and growth metrics. Founder, Chief Executive Officer ("CEO") and Chairman of the Board, Defendant Simon's, annual executive compensation was directly tied to these financial metrics. Defendant Simon's compensation, set up and approved by the Board, allows him to reap exorbitant awards and bonuses for meeting various performance goals associated with revenue growth. And Defendant Simon was able to meet these performance goals, in part, by improperly reporting the revenue recognized from sales and concessions, which was knowingly permitted by the rest of the Individual Defendants.

5. Compounding the problem, the Board justified its approval of these exorbitant awards to Defendant Simon by claiming that they were comparable to the executive compensation in other "peer" companies. In truth, however, the "peer" companies were not comparable at all to Hain; they were much larger in terms of size and profitability. For example,

█████████████████████████████████████████████████

██████████████████████████  Even using these skewed peer groups, the Board awarded

Defendant Simon millions more in compensation than the CEOs at these larger "peers." A majority of investors expressed their disapproval of both Defendant Simon's 2014 and 2015 executive compensation and the Compensation Committee members of the Board who approved it. The Board knew all of this, but chose to overpay Defendant Simon anyway.

6.     Notwithstanding their knowledge that the "peer" groups used for the CEO compensation comparisons were skewed and that their executive compensation policies created a conflict of interest for Defendant Simon that jeopardized the accuracy of the Company's reported revenue, the Individual Defendants approved the filing of Hain's misleading Form 10-Qs for the first, second, and third quarters of 2016, which continued to conceal the Company's improper recognition of revenue and lack of internal controls over financial reporting.

7.     On August 15, 2016, the Company was forced to announce the Company's decision to "delay the release of its fourth quarter and fiscal year 2016 financial results" because "the Company identified concessions that were granted to certain distributors in the United States," and "the revenue associated with those concessions [may not have been] accounted for in the correct period." As a result the Company advised that it was reevaluating whether its policy of recognizing revenue pertaining to the sale of its products to certain distributors at the time the products are shipped to such distributors was improper and should be amended to recognize said revenue at the time the products sell through its distributors to the end customers.

8.     This disclosure, and the Company's continued inability to file its quarterly reports for four consecutive quarters and the 2016 annual financial statements with the SEC, have had a drastic impact on Hain. The stock price has plunged. The Company is in danger of being delisted from NASDAQ. And Hain has defaulted on its credit agreements with lenders. Hain and certain of its officers and directors are now subjects of at least two class action complaints in

this District Court, alleging violations of federal securities laws (the "Securities Class Actions"). Further, the Board improperly rewarded Defendant Simon for conduct that contributed to the misreporting in the Company's financial statements. Accordingly, there is a clear need for Plaintiff to assert the claims herein and rectify the Individual Defendants' previous and ongoing wrongdoing.

9. In addition, the Board continues to violate basic tenets of Delaware corporate law, such as the requirements in §211 of the Delaware Corporate Law for annual meetings of a company's shareholders, as well as the provision in its own Bylaws, stating that "[t]he annual meeting of the stockholders of the Corporation for the election of directors and for the transaction of such other business as may properly come before the meeting shall be designated from time to time by the Board of Directors. (Bylaws Article II §2). The last annual meeting was held on November 19, 2015.

## B. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2). Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

11. In addition, this Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §1331, because the claims asserted arise under §§14(a) and 29(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78n & 78cc(b)). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     The Court has personal jurisdiction over each Defendant because each Defendant has committed acts within this District which are related to the claims at issue in this Complaint

13.     Venue in the Eastern District of New York is proper because Nominal Defendant Hain is headquartered in this District and almost all of the Individual Defendants are citizens of the State of New York.  Additionally, venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.

## C.     THE RELEVANT PERIOD

14.     The relevant period in this action runs from October 9, 2015 to the present ("the Relevant Period").

## D.     PARTIES

### Plaintiff

15.     Plaintiff is a current shareholder of Hain common stock.   Plaintiff has continuously held Hain common stock at all relevant times.

16.     Plaintiff is a resident of the State of Colorado and has been at all relevant times.

### Defendants

#### Nominal Defendant

17.     Nominal Defendant Hain is a Delaware corporation with its principal executive offices at 1111 Marcus Avenue, Lake Success, NY 11042, and whose stock trades on The NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "HAIN."

#### Defendant Irwin D.  Simon

18.     Defendant Irwin D. Simon ("Simon") is the founder of the Company, and has been the Company's President, CEO, and a director since the Company's inception in 1993.  In

2000, Defendant Simon was appointed Chairman of the Board and has served in that position ever since.

19.     Defendant Simon is a resident of the State of New York and has been during the entire Relevant Period.

20.     The Company provides cash and stock incentives to certain eligible Company executives, like Defendant Simon, who meet various financial and non-financial performance goals throughout a given fiscal year.   In fiscal year 2014, Defendant Simon's executive compensation totaled $11,172,452, which was comprised of approximately: $1.66 million in salary, $4.8 million in stock awards; and $4.6 million in bonuses.

21.     Defendant Simon's non-salary compensation for 2014 was determined by the Compensation Committee after concluding that certain financial and non-financial performance goals under both the 2014 Annual Cash Incentive Plan and the 2013-2014 Long Term Incentive Plan (the "2013-2014 LTIP") had been achieved during fiscal year 2014.   The Compensation Committee further determined that Defendant Simon's executive compensation was appropriate when compared to other "peer" companies.   Upon reaching these determinations, the Compensation Committee submitted the matter to the entire Board for approval, which it ultimately gave.

22.     Hain's shareholders, however, made it clear that they did not agree with these determinations.   When Defendant Simon's 2014 executive compensation was submitted for shareholder approval via a "Say on Pay" proposal in the 2014 Proxy Statement (defined below), approximately 50.1% of the Company's shareholders voted against the 2014 executive compensation approved by the Board.   In fact, shareholders were so adamantly opposed to the 2014 executive compensation award that nearly one-third of them voted to oust from the Board

the members of the Compensation Committee (*i.e.*, Defendants Berke, Futterman and O'Neil) who determined that Defendant Simon's 2014 executive compensation was justified.

23.     According to the 2014 Proxy Statement, the Compensation Committee met with investors throughout fiscal year 2014 to "better understand stockholder views on our executive compensation" and to be "responsive to views that stockholders expressed in the 2013 stockholder advisory vote on executive compensation."[1]   The 2014 Proxy Statement further stated:  "The Compensation Committee will continue to consider the outcome of the Company's Say on Pay Proposal and stockholder feedback when making further compensation decisions for our NEOs."

24.     But just as stockholder concerns were ignored in 2014, similar concerns relating to the 2015 executive compensation awards were brushed aside by the Board and Compensation Committee.  In fact, the Board's approval of Defendant Simon's 2015 executive compensation followed a nearly identical pattern to the approval process in 2014.

25.     For example, in the fiscal year ended June 30, 2015, Defendant Simon's executive compensation totaled $16,310,640, which was comprised of approximately:  $1.85 million in salary; $8.8 million in stock awards; $5.5 million in bonuses.  As with 2014, Defendant Simon's 2015 performance goals and awards were determined by the Compensation Committee pursuant to the relevant 2015 annual and long-term incentive plans, and were approved by the entire Board.

26.     Once again, the Compensation Committee met with investors throughout fiscal year 2015 to discuss any concerns over Defendant Simon's 2015 executive compensation awards.  After acknowledging that stockholders "did not express a high level of support" for the

---

[1]     According to the Company's Form 8-K, filed with the SEC on November 22, 2013 (the "11/22/13 Press Release"), approximately 41% of the Company's stockholders voted against Defendant Simon's 2013 executive compensation award.

2014 executive compensation, the Board stated how it had "incorporated" such stockholder feedback into their determinations concerning the 2015 executive compensation.

27.     Notwithstanding the Board's claims of heeding shareholders' concerns over executive compensation, the Board's Say on Pay proposal in the 2015 Proxy Statement (defined below) was rejected by a staggering 59.1% of the Company's shareholders.   Further, the Company's shareholders again sought to hold those who approved the executive compensation award accountable, with over one-third of the shareholders voting to remove from the Board those Compensation Committee members who determined Defendant Simon's 2015 executive compensation was warranted.

28.     In addition to the information directly relating to Defendant Simon, the 2015 Proxy Statement also discussed certain relationships and related-party transactions involving Defendant Simon's family:

> Mr. Simon's spouse, Daryl Simon, has been the Director of International Sales of the Company since September 1996.  During the fiscal year ended June 30, 2015, she earned a base salary of $119,442, an annual bonus of $28,620 and participates in the Company's benefit programs for its employees.  In addition, Mr. Simon's brother-in-law, Geoffrey Goldberg, currently serves as Vice President – Corporate Services and has been employed by the Company since June 2000.  During the fiscal year ended June 30, 2015, [Goldberg] earned a base salary of $191,576, a bonus of $9,900 and a car allowance of $8,400 and participates in the Company's benefit programs for its employees.  On September 23, 2014, [Goldberg] was granted 756 shares of stock, which had a grant date value of approximately $37,955.  On November 20, 2014, [Goldberg] was granted 452 shares of restricted stock, which had a grant date value of approximately $23,988.  On May 21, 2015, [Goldberg] was granted 88 shares of restricted stock, which had a grant date value of approximately $5,453.

### Defendant Andrew R. Heyer

29.     Defendant Andrew R. Heyer ("Heyer") was a Company director from 1993 until 2009, and then again from 2012 through the present.  Defendant Heyer is also the chair of the Audit Committee.

30.     In the fiscal year 2014, Defendant Heyer's director compensation totaled $219,800, which was comprised of $63,000 in cash and $166, 800 in stock awards.

31.     In the fiscal year ended June 30, 2015, Defendant Heyer's director compensation totaled $238,131, which was comprised of $63,000 in cash and $175,131 in stock awards.

32.     Defendant Heyer is a resident of the State of New York and has been during the Relevant Period.

### Defendant Adrianne Shapira

33.     Defendant Adrianne Shapira ("Shapira") has been a Company director since November 2014, is a member of the Audit Committee, and has served on the Compensation Committee since October 2015.

34.     In the fiscal year ended June 30, 2015, Defendant Shapira's director compensation totaled $201,631, which was comprised of $26,500 in cash and $175,131 in stock awards.

35.     Defendant Shapira is a resident of the State of New York and has been during the Relevant Period.

### Defendant Lawrence S. Zilavy

36.     Defendant Lawrence S. Zilavy ("Zilavy") has been a Company director since November 2002.  He is a member of the Audit Committee and Chair of the Corporate Governance and Nominating Committee.

37.     In the fiscal year 2014, Defendant Zilavy's director compensation totaled $224,800, which was comprised of $58,000 in cash and $166, 800 in stock awards

38.     In the fiscal year ended June 30, 2015, Defendant Zilavy's director compensation totaled $233,131, which was comprised of $58,000 in cash and $175,131 in stock awards.

39.     Defendant Zilavy is a resident of the State of New York and has been during the Relevant Period.

Defendant Richard C. Berke

40.     Defendant Richard C. Berke ("Berke") has been a Company director since April 2007.  He is a member of the Corporate Governance and Nominating Committee and has served on the Compensation Committee since October 2015.

41.     In the fiscal year 2014, Defendant Berke's director compensation totaled $229,800, which was comprised of $63,000 in cash and $166,800 in stock awards

42.     In the fiscal year ended June 30, 2015, Defendant Berke's director compensation totaled $228,131, which was comprised of $53,000 in cash and $175,131 in stock awards.

43.     Defendant Berke maintains a residence in the State of New York and has done so during the Relevant Period.

Defendant Scott M. O'Neil

44.     Defendant Scott M. O'Neil ("O'Neil") has been a Company director since January 2012 and is the chair of the Compensation Committee, having served on that Committee since October 2015.

45.     In the fiscal year 2014, Defendant O'Neil's director compensation totaled $219,800, which was comprised of $53,000 in cash and $166, 800 in stock awards.

46. In the fiscal year ended June 30, 2015, Defendant O'Neil's director compensation totaled $238,131, which was comprised of $63,000 in cash and $175,131 in stock awards.

47. Defendant O'Neil is a resident of the State of Pennsylvania and has been during the Relevant Period.

Defendant Raymond W. Kelly

48. Defendant Raymond W. Kelly ("Kelly") has been a director since August 2015 and is a member of the Corporate Governance and Nominating Committee.

49. Defendant Kelly did not receive compensation during the 2015 fiscal year.

50. Defendant Kelly is a resident of the State of New York and has been during the Relevant Period.

Defendant Roger Meltzer

51. Defendant Roger Meltzer ("Meltzer") has been a Company director since December 2000. He is also a partner at the law firm DLA Piper LLP (US), which provides legal services to the Company.

52. In the fiscal year 2014, Defendant Meltzer's director compensation totaled $219,800, which was comprised of $53,000 in cash and $166,800 in stock awards.

53. In the fiscal year ended June 30, 2015, Defendant Meltzer's director compensation totaled $228,131, which was comprised of $53,000 in cash and $175,131 in stock awards.

54. Defendant Meltzer is a resident of the State of New York and has been during the Relevant Period.

<u>Defendant Pasquale ("Pat") Conte</u>

55.     Defendant Pasquale ("Pat") Conte ("Conte") has been the Company's Executive Vice President and CFO since September 2015.  Prior thereto, Conte was Hain's Senior Vice President, Finance from October 2011 to September 2015, Treasurer from July 2009 to September 2015, and Vice President from July 2009 to October 2014.  Mr. Conte is a resident of the State of New York and has been during the Relevant Period.

56.     Defendants Heyer, Shapira, Simon, Conte, Zilavy, Berke, O'Neil, Kelly, and Meltzer are collectively referred to as the "Individual Defendants."  The Individual Defendants, with the exception of Defendant Conte, comprise the entirety of Hain's eight-member Board.

## E.     RELEVANT DUTIES AND CORPORATE GOVERNANCE OBLIGATIONS

### 1.     Individual Defendants' Duties and Obligations

57.     By reason of their positions as officers and/or directors of Hain, and because of their ability to control the business and corporate affairs of Hain, the Defendants owe Hain and its shareholders the fiduciary obligations of loyalty and candor, which encompass good faith and trust.  The obligations require the Defendants to use their utmost abilities to control and manage Hain in an honest and lawful manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Hain and its shareholders and to refrain from unduly benefitting themselves at the expense of the Company.

58.     Each director of the Company owes to Hain and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

59.     Because of their positions of control and authority as directors and/or officers of Hain, Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial and

directorial positions with Hain, each of the Defendants had access to information regarding the improper business practices of Hain.

60.    By virtue of these duties, Defendants were required, among other things, to:

(a)    Endeavor in good faith to ensure the Company's compliance with its legal obligations and requirements – including requirements involving the filing of accurate financial and operational information with the SEC – and with the Company's Corporate Guidelines and Code of Conduct (both defined below);

(b)    Remain informed as to how Hain conducted its operations, and, upon receipt of notice or information or red flags of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, and take steps to correct such conditions or practices;

(c)    Endeavor in good faith to ensure that the Company is operated in compliance with all applicable federal, state, and local laws, rules and regulations;

(d)    Endeavor in good faith to ensure that all Board decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives; and

(e)    Award compensation to Hain's CEO and other executives in such a manner as to incentivize its executives to have a stake in the Company's long-term value.

61.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Hain, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company during the

Relevant Period, has been ratified by the remaining Defendants, who collectively comprised all eight members of Hain's Board of Directors during the Relevant Period.

62. Moreover, these investigations and actions have irreparably damaged Hain's corporate image and goodwill.

## 2. Duties of the Audit Committee Members

63. According to its 2015 Proxy Statement, Hain's Audit Committee is required to, among other things, to monitor the Company's compliance with legal and regulatory requirements and with the Company's ethical standards. The Audit Committee is further charged with discussing significant risk areas and the steps management has taken to monitor, control, and report such exposures to the full Board of Directors. Additionally, the Audit Committee has the duty to review with the Company's counsel any legal matters that may have a material impact on the Company's financial statements, the Company's compliance with applicable laws and regulations, and material reports or inquiries received from governmental authorities. In conjunction with these duties, the Audit Committee has the authority to conduct any investigation appropriate to fulfill these responsibilities. Finally, the Audit Committee is tasked with reviewing and approving the Company's filings with the SEC.

64. The Individual Directors that served on the Audit Committee during the Relevant Period are: Defendants Heyer (Chair), Shapira, and Zilavy.

65. During fiscal year 2014, the Audit Committee met a total of nine times, on the following dates: February 2 and 7, May 5 and 9, June 12 and 18, August 18 and 26, and November 7.

66. During fiscal year 2015, the Audit Committee met a total of six times, on the following dates: February 9, May 8, August 17 and 21, November 2 and 6.

67. During fiscal year 2016, the Audit Committee met a total of four times, on the following dates: January 29, February 8, May 6, and June 10.

### 3. Duties of the Compensation Committee Members

68. According to the 2015 Proxy Statement, Hain's Compensation Committee is responsible for assisting the Board in fulfilling its oversight responsibilities in connection with executive compensation matters. Moreover, the Compensation Committee is charged with annually determining the CEO's compensation level, including all salary, bonus compensation and stock option grants as well as other equity incentives for the CEO. The Compensation Committee is also tasked with reviewing the performance goals relevant to executive officer compensation, evaluating whether the performance goals have been met, and approving the annual and long-term compensation awards for the Company's executive officers. The Compensation Committee has the authority to conduct any investigation appropriate to fulfilling its responsibilities, and it has direct access to anyone in the Company. Once the executive compensation for a given year has been determined, the Compensation Committee makes a recommendation on that matter to the Board for approval.

69. The Individual Directors that served on the Compensation Committee during the Relevant Period are: Defendants Berke (Chair), Futterman,[2] O'Neil, and Shapira. Berke, O'Neil and Shapira served from October 2015 to the present.

70. During fiscal year 2014, the Compensation Committee met a total of seven times, on the following dates: April 16, June 18, August 13, September 11, 22, and 23, and November 20th.

71. During fiscal year 2015, the Compensation Committee met a total of four times, on the following dates: March 12, June 25, September 10 and 30.

---

[2] Director Futterman was deceased as of July 2015.

72.     During fiscal year 2016, the Audit Committee met only once, on March 3.

**4.      Hain's Corporate Governance Guidelines**

73.     Pursuant to the Company's Corporate Governance Guidelines (the "Corporate Guidelines"), the entire Board is bound to adhere to the corporate governance practices discussed therein.   As relevant here, the Corporate Guidelines describe the "Board and Director Responsibilities," as follows:

> The basic responsibility of the Directors is to exercise their business judgment to act in what they reasonably believe to be in the best interests of the Company and its shareholders.  In discharging that obligation, Directors should be entitled to rely on the honesty and integrity of the Company's senior executives and its outside advisors and auditors.  Each Director is expected to spend the time and effort necessary to properly discharge his or her responsibilities.
>
> The business and affairs of the Company will be managed by or under the direction of the Board, including through one or more of its committees as set forth in the Bylaws and committee charters.  ***The Board will regularly monitor the effectiveness of management in order to evaluate whether the Company is being properly managed.***  It is the sense of the Board, however, that it should not involve itself in the day to day management decisions of the Company.
>
> ***The Board expects each Director, as well as the Company's officers and employees, to be familiar with and comply with the Company's Code of Business Conduct and Ethics.***

[Emphasis added].

74.     The Corporate Guidelines, under "Committee Charter; Annual Self- Evaluation," further mandates that "***[e]ach of the Audit Committee, the Compensation Committee and the Corporate Governance and Nominating Committee have developed, and will maintain and comply with, a charter describing, among other things, its duties and responsibilities in accordance with applicable legal and regulatory requirements, including those of Nasdaq.***"

[Emphasis added].

75.     The Corporate Guidelines also mandate that the Company's CEO be evaluated in addition to the Board and its various Committees:

The Compensation Committee will meet in an executive session without management to evaluate the performance of the Chief Executive Officer at least once a year for the purpose of setting the compensation of the Chief Executive Officer. In addition to any factors set forth in the Chief Executive Officer's employment agreement, the following factors will be considered in evaluating the performance of the Chief Executive Officer:

1. leadership and vision;

2. integrity;

3. keeping the Board informed on matters affecting the Company;

4. performance of the business;

5. development and implementation of initiatives to provide long-term economic benefit to the Company;

6. accomplishment of strategic objectives;

7. succession planning and development of management; and

8. such other factors as the Compensation Committee considers relevant.

76. As a part of carrying out these evaluations, the Corporate Guidelines provides the Board with "open access to the Company's management team and counsel." The Corporate Guidelines "encourage[ ]" its Directors to contact members of the management team and bring executives into Board meetings who "can provide additional insight into the items being discussed because of personal involvement in these areas. . . ." Further, the Corporate Guidelines grants the Board and each Committee the authority to engage independent or outside counsel, accountants or other advisors, in each case of its choice and as it determines to be necessary or appropriate.

**5. Hain's Code of Business Conduct and Ethics**

77. As referenced in the Corporate Guidelines, the Company also adheres to a Code of Business Conduct and Ethics (the "Code of Conduct"), and requires all of the Company's officers, directors, and employees to comply with the conduct outlined therein. As evidence of such compliance, the Code of Conduct directs the Company's officers, directors, and employees to, on an annual basis: (1) verify that they received, read and understand the Code of Conduct,

(2) "certify [their] commitment to [its] principles," and (3) confirm that they are not aware of any violations of the Code of Conduct.

78.     The Code of Conduct sets forth the "Responsibilities under the Code," which require the Company's officers, directors, and employees to, *inter alia*, "[f]amiliarize [them]selves with and follow the Code and all policies, laws and regulations that apply to [thei]r job" and to "[r]eport concerns and known or suspected misconduct promptly."

79.     The Code of Conduct explicitly requires compliance with all applicable laws and regulations and outlines specific conduct that must be abided by with respect to maintaining the Company's financial records and reporting to regulatory authorities.   For example, under the section titled, "We Maintain Accurate and Reliable Records," the Code of Conduct states:

> ***Accurate and reliable records are crucial to our business.  Our records are the basis of our earnings statements, financial reports and other disclosures to the public*** and guide our business decision-making and strategic planning.   Hain Celestial records include booking information, payroll, timecards, travel and expense reports, e-mails, accounting and financial data, measurement and performance records, electronic data files and all other records maintained in the ordinary course of our business.
>
> ***All Hain Celestial records must be complete, accurate and reliable in all material respects.***   Undisclosed or unrecorded funds, payments or receipts are inconsistent with our business practices and are prohibited.   ***You are responsible for understanding and complying with our record keeping policy.***   Ask your supervisor if you have any questions.

[Emphasis added].

80.     Similarly, the Code of Conduct explains the importance of maintaining accurate financial records and being in compliance with, *inter alia*, the SEC's disclosure requirements. In a section titled, "We Ensure that Hain Celestial's Financial Disclosures and Other Public Communications are Full, Fair, Accurate, Timely, and Understandable," the Code of Conduct states:

As a public company we are subject to various securities laws, regulations and reporting obligations. ***Both federal law and our policies require the disclosure of accurate and complete information regarding Hain Celestial's business, financial condition and results of operations.*** Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage Hain Celestial and result in legal liability.

Hain Celestial's chief executive officer, chief financial officer and chief accounting officer have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

[Emphasis added].

## F.  FACTUAL ALLEGATIONS CONCERNING HAIN'S MISREPORTING OF ITS FINANCIAL RESULTS

### 1.  The Company and Its Founder

81.    Founded in 1993 by Defendant Simon, Hain is a New York-based company that markets, manufactures, and sells a variety of organic, natural, and "better-for-you" products. These products are primarily sold in the following categories: grocery, snacks, tea, personal care, and poultry.

82.    According to the Company's annual report for the fiscal year ended June 30, 2015 filed on a Form 10-K with the SEC on August 21, 2015, (the "2015 10-K"), Hain "rel[ies] on independent distributors for a substantial portion of [its] sales." The 2015 10-K further represented the following regarding Hain's distribution network:

We rely upon sales made by or through non-affiliated distributors to customers. Distributors purchase directly for their own account for resale. One distributor, United Natural Foods, Inc., which redistributes products to natural foods supermarkets, independent natural retailers and other retailers, accounted for approximately 12%, 13% and 15% of our consolidated net sales for the fiscal years ended June 30, 2015, 2014, and 2013, respectively. The loss of, or business disruption at, one or more of these distributors may harm our business. If we are required to obtain additional or alternative distribution agreements or arrangements in the future,

we cannot be certain that we will be able to do so on satisfactory terms or in a timely manner. Our inability to enter into satisfactory distribution agreements may inhibit our ability to implement our business plan or to establish markets necessary to expand the distribution of our products successfully.

83.     Relatedly, the 2015 10-K noted how critical particular distributors are to the Company's bottom line, stating as follows:

> ***Our largest customer, United Natural Foods, Inc., a distributor, accounted for approximately 12%, 13% and 15% of our consolidated net sales for the fiscal years ended June 30, 2015, 2014 and 2013, respectively***, which were primarily related to the United States segment. ***A second customer, Wal-Mart Stores, Inc. and its affiliates Sam's Club and ASDA, together accounted for approximately 10%, 11% and 10% of our consolidated net sales for the fiscal years ended June 30, 2015, 2014 and 2013, respectively***, which were primarily related to the United States and United Kingdom segments. No other customer accounted for more than 10% of our net sales in the past three fiscal years.

[Emphasis added].

84.     While sales are critical to the Company's revenue and related growth goals for each year, the Company also derives a significant amount of revenue from its acquisitions of well-capitalized companies. This has prompted the Company to aggressively pursue acquisition strategies to increase this type of inorganic growth. As of 2015, Hain owned over 50 different brands, including Celestial Seasonings® and Earth's Best®.

85.     Pushing this acquisition strategy is the Company's Founder, President, CEO, and Chairman of the Board, Defendant Simon. Considered to be a "rampant consolidator among the cottage industries of natural food, having bought three dozen companies in 20 years," Defendant Simon is a "larger-than-life tycoon who devours small niche companies . . . and absorbs them into his well-oiled merchandising machine."[3] According to a consumer food advisor who knows

---

[3]     www.theglobeandmail.com/report-on-business/careers/careers-leadership/hain-celestials-irwin-simon-whats-good-for-you-is-good-for-his-business/article13465260/.

Simon: "From early on, [Defendant Simon's] vision was to build [Hain] and sell it."[4]  As

Defendant Simon candidly admitted, "it is important for me to make money."[5]

## 2.    Relevant Accounting Principles

86.    SEC Regulation S-X, codified at 17 C.F.R. § 210.4-01, provides a bright line rule

for SEC filings that are not prepared in compliance with generally accepted accounting

principles ("GAAP").   Under the regulation, "[f]inancial statements filed with the Commission

which are not prepared in accordance with generally accepted accounting principles will be

*presumed to be misleading or inaccurate*, despite footnote or other disclosures . . . ." 17 C.F.R.

§ 210.4-01(a)(1) (emphasis added).

87.    Pursuant to GAAP, "revenue should not be recognized until it is realized or

realizable and earned."   *See* SEC, Staff Accounting Bulletins, Topic 13: Revenue Recognition,

Part A.1.

88.    Hain takes a different approach.   According to the 2015 10-K, the Company

recognizes revenue as follows:

> **Revenue Recognition**
>
> Sales are recognized when the earnings process is complete, which
> occurs when products are shipped in accordance with terms of
> agreements, title and risk of loss transfer to customers, collection is
> probable and pricing is fixed or determinable.  Sales are reported
> net of sales and promotion incentives, which include trade
> discounts and promotions and certain coupon costs.  Shipping and
> handling costs billed to customers are included in reported sales.
> *Allowances for cash discounts are recorded in the period in
> which the related sale is recognized.*
>
> **Sales and Promotion Incentives**
>
> Sales incentives and promotions include price discounts, slotting
> fees and coupons and are used to support sales of the Company's

---

[4]      nypost.com/2016/08/20/hain-celestials-struggles-ruined-ceos-plan-to-sell-company/.

[5]      www.theglobeandmail.com *supra.*

products. ***These incentives are deducted from our gross sales to determine reported net sales.*** The recognition of expense for these programs involves the use of judgment related to performance and redemption estimates. Differences between estimated expense and actual redemptions are normally insignificant and recognized as a change in estimate in the period such change occurs.

*Trade Promotions*. Accruals for trade promotions are recorded primarily at the time a product is sold to the customer based on expected levels of performance. Settlement of these liabilities typically occurs in subsequent periods primarily through an authorization process for deductions taken by a customer from amounts otherwise due to the Company.

[Emphasis added].

89.     In other words, Hain "books revenue for products sold to distributors such as United Natural, when those products are ***shipped***, not when they're paid for at the checkout counter."[6] (Emphasis in original). Furthermore, Hain offers "concessions" to its distributors for selling its products. Accordingly, "[s]ince Hain recognizes revenue ***before*** the goods are sold, it needs to make an estimate of how big those concessions will be" when recognizing revenue.[7] (Emphasis in original).

90.     The Company's 2015 Form 10-K, that was signed by all eight Director Defendants, Simon, Heyer, Shapira, Berke, Kelly, Meltzer, O'Neil and Zilavy also recognize that policies pertaining to revenue recognition and sales and promotion incentives to distributors as "critical," thereby acknowledging that the Company's revenue recognition processes must be accurate due to their critical nature to the accuracy of the Company's financial reports.

91.     The 2015 Form 10-K in subsection of Item 7 entitled "Summary of Significant Accounting Policies" verified that "the Company's financial statements are prepared in accordance with accounting principles generally accepted in the United States ("US GAAP")."

---

[6]     *See* fortune.com/2016/08/17/the-mystery-of-hain-celestials-accounting/ (last visited May 8, 2017).

[7]     *Id.*

92.     In addition, Defendants Simon and Conte guaranteed the accuracy of the 2015 Form 10-K by certifying its contents were in full compliance with the Sarbanes-Oxley Act of 2002 ("SOX").

93.     Despite Defendants' representations of accuracy, the 2015 Form 10-K falsely represented the Company's financials because it failed to account for concessions granted to its distributors in a fair and accurate manner.

### 3.     The Company's Misreporting of Its Financial Results

#### a.     *First Quarter of 2016 Financial Results*[8]

94.     On November 5, 2015, the Company issued a press release announcing the Company's reporting of financial results for the first quarter ended September 30, 2015 (the "1Q 2016 Press Release"). (The Company fiscal year runs from June 30, so the first quarter of 2016 covers the period July 1 to September 30, 2015). The 1Q 2016 Press Release reported the following:

**First Quarter Performance Highlights**

• Record first quarter net sales of $687.2 million, a 9% increase over the prior year period or, on a constant currency basis, an 11% increase over prior year adjusted net sales of $642.6 million.

• Record first quarter earnings per diluted share of $0.30, *a 67% increase*; adjusted earnings per diluted share of $0.37, a 9% increase.

• Operating income of $57.5 million, 8.4% of net sales; adjusted operating income of $63.2 million, 9.2% of net sales.

95.     The press release attributed "diversification" as the fuel for its results. It stated:

We continued to benefit from the diversification of our business across our branded organic and natural product categories, sales channels and

---

[8]     On January 21, 2016, less than three months after filing the 1Q 2016 10-Q, the Company announced that Ross Weiner would be resigning from his position of Vice President - Finance, Chief Accounting Officer ("CAO") of Hain effective as of February 9, 2016 to pursue another opportunity. Upon Weiner's departure, Defendant Conte temporarily took over Weiner's duties as Chief Accounting Officer. On February 29, 2016, Michael McGuinness was appointed as the Company's new CAO.

geographies, which fueled solid worldwide results in our typically lowest sales and profitability quarter.

**First Quarter 2016**

***

"We remain optimistic about our growth opportunities in fiscal 2016 and beyond. We expect to build momentum throughout the year across our global footprint through the strength of our diversified product portfolio and customer base while investing in our brands and gaining distribution in the important health and wellness category," concluded Irwin Simon.

**Fiscal Year 2016 Guidance**

The Company reiterated its annual guidance for fiscal year 2016:

• Total net sales range of $2.97 billion to $3.11 billion, an increase of approximately 10% to 15% as compared to fiscal year 2015;

• Earnings range of $2.11 to $2.26 per diluted share, an increase of 12% to 20% as compared to fiscal year 2015.

96.     On November 2, 2015, just three days before the Company released the above-described press release the Audit Committee of the Company consisting of Defendants Heyer, Shapira and Zilavy met. Various other persons, including co-Defendants Simon and Conte attended the meeting. The Audit Committee reviewed and approved the draft Form 10-Q.

97.     November 9, 2015, the Company filed the quarterly report for the quarter ended September 30, 2015 on a Form 10-Q (the "1Q 2016 10-Q") that was discussed in the 1Q 2016 Press Release. This report, and the attached SOX certifications attesting to the accuracy of the 1Q 2016 10-Q, were signed by Defendants Simon and Conte, respectively.

98.     The 1Q 2016 10-Q also provided the following information concerning Hain's "Controls and Procedures:"

**Evaluation of Disclosure Controls and Procedures**

Our Chief Executive Officer and Chief Financial Officer have reviewed our disclosure controls and procedures as of the end of the period covered by this report. Based upon this review, these officers concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act

is (1) recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Changes in Internal Control over Financial Reporting**

During the first quarter of fiscal 2016, the Company implemented the Hyperion Financial Management system for consolidation and financial reporting resulting in changes to our processes and related internal controls over financial reporting. We expect this new reporting tool will enhance our internal control over financial reporting. Pre-implementation testing and post-implementation reviews were conducted by management to ensure that controls surrounding the system implementation process, the reporting tool, and the closing process were effective to prevent material financial statement errors. Other than changes related to this new reporting tool, no other changes in our internal control over financial reporting occurred during the period covered by this quarterly report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

99. The 1Q 2016 10-Q confirmed that "[o]ur financial statements are prepared in accordance with accounting principles generally accepted in the United States" and stated that "[t]he accounting policies that have been identified as critical to our business operations and understanding the results of our operations pertain to revenue recognition, sales and promotional incentives . . ." The 1Q 2016 10-Q then directed investors to Item 7 of the 2015 10-K for the "application of each of these critical accounting policies and estimates. . . ."

100. The 1Q 2016 10-Q also verified that the Company's financial statements were prepared in accordance with GAAP.

### b. Second Quarter of 2016 Financial Results

101. On February 1, 2016, the Company issued a press release announcing the Company's reporting of financial results for the second quarter ended December 31, 2015 (the "2Q 2016 Press Release"). The 2Q 2016 Press Release reported, in pertinent part, the following:

**Second Quarter Performance Highlights**

• Record net sales of $752.6 million, an 8% increase, or 11% on a constant currency basis, over prior year net sales of $696.4 million.

\*\*\*

• Earnings per diluted share of $0.55, a 28% increase; adjusted earnings per diluted share of $0.57, a 6% increase. Foreign currencies impacted reported results by $0.01 per diluted share.

\*\*\*

• Record operating income of $87.7 million, 11.7% of net sales; adjusted operating income of $92.9 million, 12.3% of net sales.

• Strong operating cash flow of $93.9 million, an increase of 82% over the prior year quarter.

102. Again the strong sales were attributed to Hain's global diversified market.

Defendant Simon stated:

"Our record net sales reflect the continuing strong performance from the United Kingdom and Rest of World segments, which collectively grew 12% in constant currency and the Hain Pure Protein Corporation segment ("HPPC"), which grew 21% excluding the acquisition of Empire®. Our strong sales growth was impacted in the quarter primarily by reductions in inventories at certain customers in the United States segment," said Irwin D. Simon, Founder, President and Chief Executive Officer of Hain Celestial. *We were able to deliver these strong results, reflecting our global diversified business model across Hain Celestial's organic and natural brands, product categories, customers and geographies.*"

\*\*\*

"Hain Celestial continues to be at the forefront of the evolution around changing consumer trends in consumer packaged goods with a strong global brand portfolio in key growth categories. We are uniquely positioned to satisfy the health and wellness needs of consumers with our leading natural and organic products as we work to deliver increased shareholder value," concluded Irwin Simon.

**Fiscal Year 2016 Guidance**

The Company reiterated its fiscal year 2016 guidance expectations of:

• Total net sales range of $2.90 billion to $3.04 billion, an increase of approximately 7% to 12% as compared to fiscal year 2015, and

• Earnings per diluted share range of $1.95 to $2.10, an increase of approximately 4% to 12% as compared to fiscal year 2015.

With respect to the cadence of the second half of the Company's fiscal year financial results, the Company expects net sales to be slightly lower in the third quarter as compared to the fourth quarter, while 42% to 46% of the Company's second half earnings will be in the third quarter and the balance in the fourth quarter.

103.    On February 8, 2016, the Audit Committee consisting of Defendants Heyer, Shapira and Zilvay met telephonically and discussed the draft Form 10-Q for the quarter ended December 31, 2015, which had been distributed to all members.  HAIN-0000866.  The Audit Committee reviewed and approved the draft Form 10-Q.  *Id.*

104.    On February 9, 2016, the Company filed the quarterly report for the quarter ended December 31, 2015 on a Form 10-Q (the "2Q 2016 10-Q"), that was discussed in the 2Q 2016 Press Release.  This report, and the attached SOX certifications attesting to the accuracy of the 2Q 2016 10-Q, were signed by Defendants Simon and Conte, respectively.

105.    Similarly to the 1Q 2016 10-Q, the 2Q 2016 10-Q explained the Company's revenue recognition policies, and that its sales and promotional incentives were accounting policies that are "critical to [its] business operations and understanding the results of [its] operations."  The 2Q 2016 10-Q also referenced Item 7 in the 2015 10-K, which discusses, among other things, the method by which Hain calculates revenue.

106.    The 2Q 2016 10-Q affirmed that "[t]he Company's condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X."

107.     The 2Q 2016 10-Q declared that the Company's "disclosure controls and procedures are effective" and reiterated the same representations regarding the Company's disclosure controls it had made in the 1Q 2016 10-Q.  The 2Q 2016 10-Q further reported that, other than one disclosed change, no other changes were made to the Company's internal control over financial reporting for that time period.

### c.     Third Quarter of 2016 Financial Results

108.     On May 4, 2016, the Company issued a press release announcing the Company's financial results for the third quarter ended March 31, 2016 (the "3Q 2016 Press Release").  This press release, like the previous two, touted record sales for the 3Q 2016, ending on March 31, 2016.  The 3Q 2016 Press Release reported the following:

**Third Quarter Performance Highlights**

▪ Net sales of $750.0 million.

▪ Hain Celestial US net sales increased by 2.7% on a constant currency basis over the prior year period.

▪ ***Earnings per diluted share of $0.47, a 47% increase over the prior year period***, or on an adjusted basis $0.49, a 9% increase over the prior year period.

▪ Operating income of $69.0 million, or 9.2% of net sales; adjusted operating income of $80.4 million, or 10.7% of net sales.

109.     Defendant Simon attributed the strong financial results to "diversification" and "solid execution."  He stated:

"The diversification of our product portfolio with leading organic, natural and better-for-you brands around the world, combined with our team's solid execution of our operational initiatives fueled our financial performance.  We are extremely pleased with our US results where we returned to growth in the third quarter and expect these trends to continue."

***

**Fiscal Year 2016 Guidance**

The Company updated its fiscal year 2016 guidance expectations:

• Total net sales range of $2.946 billion to $2.966 billion, an increase of approximately 9% to 10% as compared to fiscal year 2015, and

• Earnings per diluted share range of $2.00 to $2.04, an increase of approximately 6% to 9% as compared to fiscal year 2015.

110.    On May 6, 2016, the Audit Committee met and discussed the draft Form 10-Q for the quarter ended March 31, 2016.  HAIN-0000278.  The Audit Committee reviewed and approved the draft Form 10-Q.  *Id.*

111.    On May 10, 2016, the Company filed the quarterly report for the quarter ended March 31, 2016 on a Form 10-Q ("3Q 2016 10-Q") that was discussed in the 3Q 2016 Press Release.  This report, and the attached SOX certifications attesting to the accuracy of the 3Q 2016 10-Q, were signed by Defendants Simon and Conte, respectively.

112.    Similarly to the 1Q 2016 and 2Q 2016 10-Qs, the 3Q 2016 10-Q explained the Company's revenue recognition policies, and that its sales and promotional incentives were accounting policies that are "critical to [its] business operations and understanding the results of [its] operations."  The 3Q 2016 10-Q also referenced Item 7 in the 2015 10-K, which discusses, among other things, the method by which Hain calculates revenue.

113.    The 3Q 2016 10-Q affirmed that "[t]he Company's condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X."

114.    The 3Q 2016 10-Q declared that the Company's "disclosure controls and procedures are effective" and reiterated the same representations regarding the Company's disclosure controls it had made in the 1Q 2016 and 2Q 2016 10-Qs.  Unlike the 1Q 2016 and 2Q 2016 10-Qs, however, the 3Q 2016 10-Q did not contain any representation about changes to the Company's internal control over financial reporting.

115.    The three quarterly reports for Fiscal Year 2016 that had been reviewed and approved by Board members Simon, Heyer, Shapira and Zilavy were all false in that the Company's internal controls were inadequate and the reported revenue was recognized in a manner that was not compliant with GAAP.

### 4.    The Truth Emerges and Hain's Stock Price Plummets in Response

116.    On August 15, 2016, the Company issued a press release announcing the Company's decision to "delay the release of its fourth quarter and fiscal year 2016 financial results" (the "8/15/16 Press Release").

117.    The 8/15/16 Press Release stated that "[d]uring the fourth quarter, the Company identified concessions that were granted to certain distributors in the United States," and "the revenue associated with those concessions [may not have been] accounted for in the correct period." The Company expanded on this, explaining as follows:

> Previously, the Company has recognized revenue pertaining to the sale of its products to certain distributors at the time the products are shipped to such distributors.  The Company is evaluating whether the revenue associated with the concessions granted to certain distributors should instead have been recognized at the time the products sell through its distributors to the end customers.

118.    The 8/15/16 Press Release further revealed that the Company was "evaluating its internal control over financial reporting." As a result, the Company announced that it would "delay . . . the timely filing of its Annual Report on Form 10-K for its fiscal year ended June 30, 2016" up "until the completion of the independent review of the Audit Committee and of the audit process relating to the 2016 fiscal year."

119.    The Company insisted that it was only "evaluating" the impact of the misreporting, assuring investors that the errors would not "impact the total amount of revenue ultimately recognized by the Company."  But this type of wishful thinking has had no support

and is, in fact, undermined by the Company's "separate" announcement in the 8/15/16 Press Release that it would not meet its guidance for fiscal year 2016. It is intrinsically ridiculous for the Company to declare that its accounting improprieties would have no impact on the total revenue, while admitting it was incapable of filing a financial statement for Fiscal Year 2016.

120. As a result of these disclosures, the price of Hain common stock dropped more than 26% or $14 per share to close at $39.35 per share on August 16, 2016, a market capitalization drop of $1.4 billion on significantly high trading volume.

### 5. The Aftermath of Hain's Misreporting Disclosures

#### a. *Analysts Downgrade Hain Stock and Express Concern Over the Company's Failure to File Its Financial Results*

121. Following the 8/15/16 Press Release announcing that the Company would not be filing its financial results on time and was evaluating its internal controls as a result, analysts expressed surprise and concern over the Company's outlook.

122. Within two days of the announcement, several analysts downgraded the Company stock. For example, analysts at SunTrust Robinson Humphrey downgraded Hain from Buy to Neutral "[d]ue to the limited visibility as to size of the F4Q miss and the impact of the accounting issue." Barclays downgraded from Overweight to Equal Weight because "there is sufficient uncertainty around any potential outcome and time frame of the review [of Hain's internal controls and financial reporting]." Echoing that concern, analysts at Maxim Group downgraded Hain stock from Buy to Hold "because we are in the dark about its revenue recognition policies and the percentage of revenues affected." PiperJaffray also downgraded the Company's stock and reiterated: "As we noted back in January, the departure of the CFO and resignation of the chief accounting officer in a short period of time left us concerned on the state of finance management . . . ." Similarly, analysts at Wedbush downgraded the Company's stock

and noted that "uncertainty as to the ultimate impact of accounting questions and disappointing FY16 results to expectations" cause them to "have limited conviction HAIN shares offer much near-term upside."

### b. First Late Filing and Its Consequences

#### 1) First Late Filing Notice

123.    On August 30, 2016, the Company filed a Notification of Late Filing on a Form NT 10-K with the SEC, signed by Defendant Conte (the "First Late Filing Notice"), which stated that Hain would be unable to timely file its annual report for the fiscal year ending June 30, 2016.

124.    To explain the Company's non-compliance with filing deadlines, the Company stated that, as disclosed in the 8/15/16 Press Release, "during its fourth quarter, the Company identified concessions that were granted to certain distributors in the United States" and that it was still "evaluating whether the revenue associated with those concessions was accounted for in the correct period" and it was also evaluating "the effectiveness of its internal control over financial reporting."

125.    The Company did not disclose when it would be able to file its annual report, and instead simply stated that it "does not expect to file its Form 10-K until the completion of the Audit Committee's review of these matters and the audit process relating to the 2016 fiscal year." The Company even reported that it was "unable to provide a reasonable estimate of the results of operations for the fiscal year ended June 30, 2016 until such review and evaluation are complete."

126.    The Company also explained, in its First Late Filing Notice, that "one or more material weaknesses in the Company's internal control over financial reporting may be identified in connection with the ongoing review," there is "the possibility that the ongoing review may

identify errors, which may be material, in the Company's revenue recognition accounting," and that "the Company may need to restate its financial statements."

### 2) *Notice of Non-Compliance Related to Delayed Filing of the 2016 10-K*

127. On September 1, 2016, the Company issued a press release disclosing it had received a letter of non-compliance from NASDAQ (the "9/1/16 Press Release").

128. The 9/1/16 Press Release explained that the Company "received a notification letter dated August 31, 2016 from the Nasdaq Stock Market, Inc. ("Nasdaq") stating that the Company no longer complies with Nasdaq Listing Rule 5250(c)(1), which requires timely filing of reports with the Securities and Exchange Commission (the "SEC"). Nasdaq sent the notice as a result of the Company's inability to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "Form 10-K") by August 29, 2016."

129. The 9/1/16 Press Release also explained that "the Company has 60 calendar days to submit a plan to regain compliance" and "[i]f the plan is accepted, the Company could be granted up to 180 days from the Form 10-K's original due date to regain compliance."

130. The Company reported that it expected to submit a plan to regain compliance within the timeline prescribed by NASDAQ.

### 3) *First Limited Waiver and Extension of Hain's Credit Agreement*

131. On September 26, 2016, the Company issued a press release announcing that it had received a limited waiver and extension of its obligation under its credit agreements to timely report accurate financial results with the appropriate regulatory authorities (the "First Waiver").

132. According to the First Waiver, the Company was granted a "limited waiver and extension of certain obligation under its unsecured credit facility from its lenders regarding the

delivery of its fiscal year 2016 financial statements and, if necessary, its first quarter fiscal year 2017 financial statements until December 27, 2016," which would "allow Hain Celestial to be compliant with its borrowing obligations while the Company works to complete the filing of its Annual Report on Form 10-K for its fiscal year ended June 30, 2016."

133.    The Company further reported that:

> As of June 30, 2016, there were $828 million in borrowings under the credit agreement, which included the Company utilizing its revolving credit facility to redeem its $150 million of senior notes as well as the $114 million acquisition of Orchard House Foods in December, 2015. The $828 million compares to $660 million of revolving credit and $150 million in senior notes in the prior year period. The Company had $128 million in cash from its worldwide operations at June 30, 2016.

#### 4)    *November 3, 2016 Press Release*

134.    On November 3, 2016, the Company issued a press release announcing that the Listing Qualifications Staff of NASDAQ had "granted the Company's request for an exception to Nasdaq's filing requirement, as set forth in Nasdaq Listing Rule 5250(c)(1)" (the "11/3/16 Press Release").

135.    The 11/3/16 Press Release reported that, on October 31, 2016, "the Company timely submitted to Nasdaq its plan to regain compliance with the Rule and, on November 2, 2016, the Company received formal notice from the Staff that the Company had been granted an extension, through February 27, 2017, to file its periodic reports with the SEC."

### c.    *Second Late Filing and Its Consequences*

#### 1)    *Second Late Filing Notice*

136.    On November 10, 2016, the Company filed a Notification of Late Filing on a Form NT 10-Q with the SEC, signed by Defendant Conte (the "Second Late Filing Notice").

137. The Second Late Filing Notice announced that the Company would not be able to timely file its quarterly report for the quarter ended September 30, 2016 by the original due date on November 9, 2016 – the day before the Company filed the Second Late Filing Notice.

138. The Company, referring to its previous announcements in the 8/15/16 Press Release, noted that "during its fourth quarter for the fiscal year ended June 30, 2016, the Company identified concessions that were granted to certain distributors in the United States," was evaluating whether the revenue associated with those concessions was "accounted for in the correct period," and was "evaluating its internal control over financial reporting."

139. The Company reported that the Audit Committee was engaged in "an independent review of these matters" and had "retained independent counsel to assist in that review."

140. The Second Late Filing Notice advised that the Company would not be able to file its Form 10-Q until the Audit Committee had completed its "review of these matters, the audit process relating to the 2016 fiscal year and the filing of its [2016 10-K]." The Company admitted that it "does not anticipate filing the Form 10-Q within the five-day period provided by Rule 12b-25" but rather would file the untimely Form 10-Q "as soon as practicable."

### 2) *November 16, 2016 Press Release*

141. On November 16, 2016, the Company issued a press release announcing the results of the Audit Committee's "independent review with external counsel into concessions with respect to certain distributors in the United States" (the "11/16/16 Press Release").

142. Referring to the 8/15/16 Press Release, the Company noted that "during the fourth quarter of fiscal year 2016 it had identified concessions that were granted to certain distributors in the United States and that the Audit Committee had retained independent counsel to assist in its independent review of such matter." The Company reported that this review "which was

extensive" "had been concluded" and "found no evidence of intentional wrongdoing in connection with the Company's financial statements."

143.    The Company further acknowledged that it "has begun to implement a remediation plan to strengthen its internal controls and organization."  Defendant Simon added that the Company was "taking concrete measures to remediate as well as strengthen our internal controls.  We are extremely pleased that the Company can now move forward with its reporting process as we put these challenges behind us."

144.    The November 16, 2016 Press Release rather remarkably states:

The review, which was extensive, found no evidence of intentional wrongdoing in connection with Company's statements.

Again, like the Company's self-serving promise that the accounting improprieties would not affect overall revenue, even though the Company was incapable of issuing a financial statement (*supra* at ¶119), it simply makes no sense that the Audit Committee's investigation could unequivocally exculpate itself from any intentional wrongdoing when it had not even completed its internal accounting review and audit process.

145.    Despite this assurance that Hain was poised to return to timely reporting of its financial results, the 11/16/16 Press Release cautioned that "Hain Celestial will not be in a position to release financial results until the completion of the Company's internal accounting review and the audit process.  The Company is working diligently on this matter and will, as soon as reasonably practicable, make a further announcement regarding the timing of the release of its financial results."

### 3) *Second Limited Waiver and Extension to Hain's Credit Agreement*

146.    On December 20, 2016, the Company issued a press release announcing that it had received a Second Limited Waiver and Extension to the Second Amended and Restated Credit Agreement from its various lenders (the "12/20/16 Press Release").

147.    According to the 12/20/16 Press Release, the Company was able to secure a second "waiver and extension of certain obligations under its unsecured credit facility from its lenders until February 27, 2017. This relates to the delivery of the Company's financial statements for fiscal year 2016, first quarter fiscal year 2017, and if necessary, second quarter fiscal year 2017, concurrent with the compliance extension previously granted by The Nasdaq Stock Market LLC."

148.    The 12/20/16 Press Release explained that this waiver "will allow Hain Celestial to be compliant with its borrowing obligations while the Company works to complete the filing of its Annual Report on Form 10-K for its fiscal year ended June 30, 2016 as well as its first quarter and second quarter fiscal year 2017 financial statements."

149.    The Company further reported that the "unsecured $1 billion senior credit facility is scheduled to mature in December 2019 and may be increased by an additional $350 million provided certain conditions are met."

### d.    *Third Late Filing and Its Consequences*

### 1)    *Third Late Filing Notice*

150.    On February 10, 2017, the Company filed a Notification of Late Filing on a Form NT 10-Q with the SEC, signed by Defendant Conte (the "Third Late Filing Notice").

151.    The Third Late Filing Notice announced that the Company would not be able to timely file its  quarterly report for the quarter ended December 31, 2016 by the original due date on February 9, 2017.

152.    The Company stated that, as it previously disclosed in the 8/15/16 Press Release, "during the fourth quarter of fiscal 2016, the Company identified concessions that were granted to certain distributors in the United States" and that it had "commenced an internal accounting review in order to determine whether the revenue associated with those concessions was accounted for in the correct period and to evaluate its internal control over financial reporting."

153.    The Company reported that the Audit Committee "separately conducted an independent review of these matters and retained independent counsel to assist in their review." The Company reiterated that it had announced in the 11/16/16 Press Release that the Audit Committee's "independent review" was finished and the Committee had concluded that there was "no evidence of intentional wrongdoing in connection with the Company's financial statements."  Despite this assurance, the Company admitted that, while the "initial focus of the Company's internal accounting review pertained to the evaluation of the timing of the recognition of the revenue associated with the concessions granted to certain distributors," the Company "subsequently expanded its review to perform an analysis of previously-issued financial information in order to identify and assess any potential errors . . . ."

154.    The Third Late Filing Notice further admitted that the Company "would not be in a position to release financial results until completion of its internal accounting review and audit process," noting that "the Company does not anticipate filing the Form 10-Q within the five-day period provided by Rule 12b-25" but rather would file the untimely Form 10-Q "as soon as practicable."

155.    Separately, almost as an afterthought, the Third Late Filing Notice announced that the SEC had issued a formal order of investigation on the Company, and that, pursuant to this order, the SEC had issued a subpoena on Hain seeking relevant documents.  The Company acknowledged that it "is in the process of responding to the SEC's requests for information and intends to cooperate fully with the SEC."

### 2)    *Analysts Believe the Revenue Recognition Problems Are More Widespread than Previously Reported by the Company*

156.    On January 18, 2017, The Motley Fool published an article by Brian Stoffel titled "3 Great Reasons to Sell Hain Celestial Group Inc."[9]  After discussing the 8/15/16 and 11/16/16 Press Releases – which announced the Company's inability to file its fiscal year 2016 financial results due to revenue recognition issues surrounding concessions to Hain's distributors and the results of the Company's internal review into those matters, respectively – Stoffel notes:

> It's been over 60 days since then, and 150 days since the problems surfaced, and we still have no idea what the scope and consequence of these "concessions" truly are.  While it's admirable that the company is apparently doing a thorough job, with each passing day it becomes increasingly likely that these concessions were a bigger problem than originally feared.

157.    On February 14, 2017, SeekingAlpha published an article titled "Hain Celestial Quietly Drops a Bomb," wherein analyst Rodney Beasley discusses the implications of Hain again missing the deadline for filing its financial results.[10]  In particular, Beasley states:

> **All bets are off that the [revenue recognition] problems were contained to 'certain distributors' as the company originally framed the problem in August [of 2016].**
>
> You can bet the company knew about this investigation in August or soon thereafter.  So disclosing now, one day before the SEC deadline for an extension seems a bit suspect.  Not to mention the play on words in the

---

[9]    *See* www.fool.com/investing/2017/01/18/3-great-reasons-to-sell-hain-celestial-group-inc.aspx (last visited May 8, 2017).

[10]    *See* seekingalpha.com/article/4045738-hain-celestial-quietly-drops-bomb (last visited May 8, 2017).

completion of audit press release, which had many investors thinking it had a clean bill of health. . . . Anyone who has been burned on an earnings delay due to accounting issues knows to never take what a company says at face value. They never ever come out and say our books are cooked. As we mentioned in August, the bad news never comes out all at once.

[Emphasis in original].

158. Beasley also reported, with prescience, that Hain was in jeopardy of defaulting with lenders for failing to produce its financial results as required by the Credit Agreement, reminding investors that such breach of the Company's financial covenants was "[n]ot a good thing" and that "a company can go from bad to toxic as the credit ratings get slammed."

159. Similarly, a blog titled "Excessive compensation and accounting misstatements at an organic food company," published by Cengage Learning, Inc. on August 24, 2016 (the "Cengage blog")[11] characterized the Company's revenue recognition misreporting as follows:

> The accounting error was one of "counting chickens before they hatched" – *a classic manipulation of earnings*. Hain Celestial was found to have recognized sales (and income) when they were shipped to distributors . . . rather than at the later date when they would be sold to customers. This violates GAAP and overstates earnings in an earlier accounting period.

### 3) *Notice of Delisting or Failure to Satisfy a Continued Listing Rule*

160. On February 23, 2017, the Company issued a press release disclosing the receipt of a second non-compliance letter from NASDAQ (the "2/23/17 Press Release").

161. The 2/23/17 Press Release explained that the Company "received a letter dated February 16, 2017 from the Nasdaq Listing Qualifications Staff indicating that, based upon the Company's failure to timely file its Quarterly Report on Form 10-Q for the quarter ended December 31, 2016 (the "Second Quarter Form 10-Q") with the [SEC], the Company did not

---

[11] *See* community.cengage.com/GECResource2/info/b/business/archive/2016/08/23/excessive-compensation-and-accounting-misstatements-at-organic-food-company (last visited on May 8, 2017).

satisfy Nasdaq Listing Rule 5250(c)(1) (the "Rule"), which requires issuers to timely file periodic reports with the SEC."

162. The Company reported that it "fully intends to continue to take all steps necessary to regain compliance with the Rule."

### 4) *Third Limited Waiver and Extension to Hain's Credit Agreement*

163. On February 27, 2017, the Company issued a press release announcing that it had entered into a Third Limited Waiver and Extension to the Second Amended and Restated Credit Agreement with various lenders (the "2/27/17 Press Release").

164. According to the 2/27/17 Press Release, the Company was able to secure "a waiver and extension of certain obligations under its unsecured credit facility from its lenders until May 30, 2017. This relates to the delivery of certain financial information under the credit facility including the Company's audited financial statements for its fiscal year 2016 as well as the financial statements for the first and second quarters of fiscal year 2017."

165. The Company reported that there was $790 million in borrowings under the credit facility, and the Company had $157 million in cash from its worldwide operations, as of December 31, 2016.

### 5) *Notice of Non-Compliance Related to Delayed Filing of the 2016 10-K and First and Second Quarter 2017 10-Qs*

166. On March 6, 2017, the Company announced that it had received a third letter of non-compliance from Nasdaq. According to the press release, the Company "as expected," was notified on February 28, 2017 that it had not yet "regained compliance with NASDAQ Listing Rule 5250(c)(1) (the 'Rule'), the continued listing requirement to timely file all required periodic reports with the Securities and Exchange Commission (the 'SEC'), and, therefore, that its common stock would be subject to delisting unless the Company timely requests a hearing

before a NASDAQ Hearings Panel (the 'Panel').  The Company fully intends to timely request a hearing before the Panel to present its plan for regaining compliance with the Rule and request continued listing pending its return to compliance."

167.    The 3/6/17 Press Release reported that the Company intended to make a presentation to the Panel "to grant the Company an extension of time within which to regain compliance with the Rule for a period of up to 360 days from the original due date of the Company's first late filing."

168.    The Company indicated that it still needed to file its 2016 10-K and 10-Q for the periods ended September 30, 2016 and December 31, 2016 and "is working toward a conclusion in its financial reporting process."

### e.    Fourth Late Filing Notice

169.    On May 11, 2017, the Company filed a Notification of Late Filing on a Form NT 10-K with the SEC, signed by Defendant Conte (the "Fourth Late Filing Notice").

170.    The Fourth Late Filing Notice announced that the Company would be unable to timely file its quarterly report for the quarter ended March 31, 2017 by the original due date on May 10, 2017 – the day before the Company filed the Fourth Late Filing Notice.

171.    The Fourth Late Filing Notice repeated the same background information previously provided in the 8/15/16 Press Release, and First, Second, and Third Late Filing Notices: "[D]uring the fourth quarter of fiscal 2016, the Company identified concessions that were granted to certain distributors in the United States" and that it had "commenced an internal accounting review in order to determine whether the revenue associated with those concessions was accounted for in the correct period and to evaluate its internal control over financial reporting."

172.     Similarly, the Company once again touted that the Audit Committee "separately conducted an independent review of these matters" and concluded that there was "no evidence of intentional wrongdoing in connection with the Company's financial statements."

173.     The Fourth Late Filing Notice also announced that "[a]t this time, the Company believes that its internal accounting review is nearing completion" and "presently anticipates that it will be in a position to file" the missing annual and quarterly reports "by the end of May 2017."

174.     Despite indicating that the missing earnings reports would be filed within two weeks of the Fourth Late Filing Notice, the Company stated that it is "unable to provide a reasonable estimate of the results of operations for the quarter ended March 31, 2017 because . . . the Company continues to be in the process of completing the Company's annual audit of its financial statements for fiscal year 2016 and its quarterly review of its financial statements for the first, second, and third quarters of fiscal year 2017."

175.     The Fourth Late Filing Notice also disclosed that the Company "anticipate[s]" that these earnings statements will reflect that there has been "significant change[s] in results of operations from the corresponding period for the last fiscal year."

176.     Expanding on this, the Fourth Late Filing Notice explained that it contained "forward-looking statements" concerning, *inter alia*, the filing of the Company's financial reporting and that it was possible that the Company "will not be able to file its Form 10-Q within the five-day extension permitted by the rules of Securities and Exchange Commission." The Fourth Late Filing Notice further disclosed that it was possible that "one or more material weaknesses in the Company's internal control over financial reporting may be identified" and that the Company "may need to restate its financial statements."

## G. DEFENDANTS VIOLATE THEIR OWN BY-LAWS AND DELAWARE LAW BY FAILING TO HOLD ANNUAL STOCKHOLDERS MEETING

177. Article II, Section 2 of the Amended and Restated By-Laws of the Company states as follows:

> The ***annual*** meeting of the stockholders of the Corporation for the election of directors and for the transaction of such other business as may properly come before the meeting, shall be designated from time to time by the Board of Directors.

[Emphasis added].

178. The last Annual Meeting of Stockholders was held on November 19, 2015. The Defendants failed to designate any meeting since that time in violation of Delaware law and the Company's own by-laws.

179. Section 211(c) of Title 8 of the Delaware Code requires that an annual meeting be held within a period of a least 13 months after the last annual meeting, or "the Court of Chancery may summarily order a meeting to be held upon the application of any stockholder or director."

180. Defendants' failure to designate a time and place of an annual meeting of stockholders is in violation of both 8 *Del. C.* §211(c) and of its own Amended By-laws, and seriously divests interested shareholders with voting rights from the opportunity to vote on current issues of importance to the shareholders.

### Summary of Defendants' Wrongful Conduct

181. In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly failed to ensure that Hain, its directors, and officers complied with federal regulations and GAAP when the Company misreported its revenue results.

182. In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly failed to timely disclose the revenue recognition problems within four days of

discovering that the Company's results of operations and financial condition had been misreported, as required by Rule 8-K Disclosure Requirements promulgated by the SEC.

183.    In breach of their fiduciary duties, the Individual Defendants consciously disregarded their duty to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

184.    In breach of their fiduciary duties, the Individual Defendants knowingly, and consciously caused the Company to breach its credit agreement, and, as a result, exposed the Company to the possibility of defaulting with its lenders.

185.    In breach of their fiduciary duties owed to the Company, the Individual Defendants willfully and consciously made, or caused the Company to make, false and misleading statements and omissions of material fact with respect to the Company's compliance with federal regulations and GAAP, the adequacy of its disclosure controls and internal controls over financial reporting, and the Company's financial results.

186.    In breach of their fiduciary duties owed to Hain, the Individual Defendants willfully or recklessly caused Hain to repurchase Company stock at artificially inflated prices for at least $22.4M during the part of the Relevant Period that at least includes the following period of time:  October 1, 2015 to March 31, 2016.

187.    In violation of the Corporate Guidelines, the Individual Defendants (excluding Defendant Conte) failed to maintain appropriate oversight of the Company's internal controls over public reporting of financial statements and consciously disregarded their duties of loyalty and care to act in the best interests of the Company, to use their free access to management to obtain all information necessary to fulfill their duties, and to properly evaluate themselves and the Company's CEO.

188.     In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to (1) comply with federal law and regulations, including, but not limited to, the reporting obligations under GAAP and SEC Form 8-K, (2) protect corporate assets, (3) engage in fair dealing, (4) avoid using corporate opportunities for personal gain, (5) avoid conflicts of interest, (6) report violations of the Code of Ethics, (7) appropriately maintain the Company's books, records, accounts, and financial statements, and (8) make accurate filings with the SEC.

## H.     FACTUAL ALLEGATIONS CONCERNING CORPORATE WASTE AND UNJUST ENRICHMENT

189.     The oversight problems crippling Hain were not limited to the improper recognition of revenue or the misreporting of the Company's financial results.  Indeed, the Individual Defendants as a whole, and the members of the Compensation Committee in particular, also breached their fiduciary duty of loyalty by failing to engage in an appropriate review of executive compensation and knowingly or recklessly approving an inappropriately high compensation package for Defendant Simon based on skewed data and ignored shareholder outrage over the excessive compensation.  As a result of this conduct, the Company wasted its financial resources, while Individual Defendant Simon was unjustly enriched.

### 1.     Defendant Simon's Recent Executive Compensation

190.     As noted above, according to the Company's 2015 Proxy Statement, in fiscal year 2015 Defendant Simon received $16,310,640 in total compensation, which was comprised of approximately:  $1.85 million in salary; $8.8 million in stock awards; $5.5 in bonuses and other compensation.

191.     According to the Company's Schedule 14A filed with the SEC on October 10, 2014 (the "2014 Proxy Statement"), Defendant Simon received $11,172,452 in total

compensation for fiscal year 2014, which was comprised of approximately: $1.6 million in salary; $4.8 million in stock awards; and $4.6 million in bonuses and other compensation.

192. The 2014 Proxy Statement reported that, for fiscal year 2013, Defendant Simon received a staggering $26,493,755 in total compensation, which was comprised of approximately: $1.6 million in salary; $20.8 million in stock awards; and $4 million in bonuses and other compensation.

193. Over the most recent three years of available compensation information (*i.e.*, fiscal years 2013-2015), Defendant Simon received an average of $18 million in annual compensation.

    **2.    The Board's Approval of Defendant Simon's Exorbitant Executive Compensation Was Based on Skewed Data that Directors Knew Was Inaccurate**

194. The Compensation Committee and Board based its decision to approve Defendant Simon's executive compensation on benchmarking data ████████████████████ ████████████████████████████████████████████ But these purported peers were cherry-picked by the Defendants on the Compensation Committee, Defendants Berke, O'Neil and Shapira, to include vastly larger and more lucrative companies in an effort to justify the excessive executive compensation for, among others, Defendant Simon. Even after using such skewed data, the Board still awarded Defendant Simon executive compensation packages that were higher than almost all of these so-called "peer" companies. The Board's knowing reliance on the skewed data ████████████████ to award grossly excessive executive compensation constitutes a breach of their fiduciary duty of care and loyalty, constitutes corporate waste, and resulted in Defendant Simon's unjust enrichment.

195. Documents obtained by Plaintiff through his 220 Request show that the Compensation Committee met on September 12, 2013 and reviewed the peer group analysis

█████████████████ *See* HAIN-0000239-242 (the 9/12/13 Compensation Committee Minutes); HAIN-0000119-126 (9/26/13 Board Minutes reporting on the Compensation Committee's meeting from earlier that day). ████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ *Id.* at HAIN-0000125. During that same meeting, the Compensation Committee adopted █████████████████████████████

for purposes of determining and justifying the Company's executive compensation. *Id.*

196. But this use of ███████████████████ was blatantly flawed. As reported in a September 21, 2013 *New York Times* article by Gretchen Morgenson titled "A Better Way to Compare C.E.O. Pay" (the "*Compare C.E.O. Pay* article"), the selected companies ██████████

███████████████████████ Initially, the article described the methods available to determine "How much pay is too much pay?" and noted the possibility for skewed data in peer group studies ████████████████████

197. According to the *Compare C.E.O. Pay* article, peer group studies are only as good as the "peers" selected for comparison, stating that simply comparing the compensation awards at other public companies "will do little to help shareholders understand whether the executive pay awarded by their companies is appropriate and if not, how off the charts it is." The article went on to state as follows:

> A far more meaningful comparison for regulators is the peer groups public companies choose to use as benchmarks when setting their pay packages. These peer groups, which are supposed to include similar companies, often don't. In many cases, companies choose peers that are far larger or more complex and whose executives are paid more to manage that size and complexity. ***Therefore, the inclusion of these companies in a peer group can skew an executive's pay higher. Investors have a name for such companies: aspirational peers***.

[Emphasis added].

198.    The  peer  group  analysis  ████████████████  was  stacked  with  such

aspirational peers.  As the *Compare C.E.O. Pay* article observed:

> In its proxy statement, Hain discloses two different peer groups that it uses
> to benchmark pay.   One consists of many food and beverage companies,
> including Chipotle Mexican Grill, Mead Johnson and United Natural
> Foods.  ***Most have higher revenue than Hain's and half have larger
> market capitalizations.  And yet Hain's chief executive received far more
> than the $3.9 million median pay for the C.E.O.'s at those larger peers***.

> The other peer group used by Hain consists of companies whose founders,
> like Mr. Simon, still run the show.  This peer group is made up of 14
> companies, including Costco and Starbucks.   The revenues of most of
> those companies were significantly higher than Hain's — Costco, for
> example, has $99 billion in revenue compared to $1.4 billion for Hain.
> Nevertheless, these peers paid their executives less — a median of $4.8
> million versus Hain's $6.5 million.

[Emphasis added].

199.    Adding insult to injury, "[a]fter Hain tilted the playing field in its favor, Mr.

Simon received far more than the median pay awarded to chief executives at those larger

peers."[12]

200.    Documents obtained by Plaintiff through his 220 Request show that the

Compensation Committee met several more times over the next two months to discuss this

matter further.  For example, on September 26, 2013, the Compensation Committee members

once again discussed the peer group information ████████████████████  and once

again approved its use for determining the appropriate executive compensation for Defendant

Simon and others.  HAIN-0000233-236.

---

[12]     *See* Gretchen Morgenson, THE NEW YORK TIMES, "Bloated Pay Came Before Hain Celestial's Error"
(August 19, 2016) (the "Bloated Pay Article") (following up on the compensation issues raised in the *Compare
C.E.O.   Pay*   article).        www.nytimes.com/2016/08/21/business/bloated-pay-came-before-hain-celestials-
error.html?rref=collection%2Fcolumn%2Ffair-
game&action=click&contentCollection=business&region=stream&module
=stream_unit&version=search&contentPlacement=1&pgtype=collection&_r=0.

201.     On October 29, 2013, the Compensation Committee, including Defendants Berke and O'Neil with Defendant Simon in attendance, convened a meeting (*see* HAIN-0000106-112) to discuss, *inter alia*,  HAIN-0000084-95.     After approving the use of the peer groups ███████████████ for its determinations on executive compensation, the Compensation Committee discussed approving management's suggested total compensation.  Notably, the Compensation Committee █████

██████████████████████████████████████████████████

███████     *See* HAIN-0000106-112; HAIN-0000231-232.

202.     On November 19, 2013, the entire Board, including Defendants Berke, Simon, Meltzer, O'Neil and Zilavy, met and received a report from Defendant Berke on, among other things, the Compensation Committee's ████████████████████████████

See HAIN-0000106-112.

203.     On June 18, 2014, the entire Board, consisting of Defendants Simon, Berke, Heyer, Meltzer, O'Neil and Zilavy,   met and discussed, *inter alia*, the report from the Compensation Committee's meeting earlier that day.  HAIN-0000096-102.  Defendant Berke reported that the Compensation Committee had reviewed ████████████████████

████████████████████████████████     The Compensation Committee "concluded that the Company's executive compensation policies and practices do not encourage or create risks that are reasonably likely to have a material adverse effect on the Company." *Id.* at HAIN-0000099.

204.     Defendant Berke also reported that, in accordance with its charter, the Compensation Committee had conducted an evaluation of its performance for the past fiscal

year. *Id.* at HAIN-0000100. In connection with that evaluation, the Compensation Committee created ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ HAIN-0000192-197.

205. As the ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ *Id.* at HAIN-0000192. Despite the obvious suggestion that such an evaluation should be conducted more frequently, the Compensation Committee did the bare minimum.

206. On August 13, 2014, the entire Board, including Defendants Simon, Berke, Heyer, O'Neil and Zilavy, met and discussed, *inter alia*, the report from the Compensation Committee's meeting on July 28, 2014 (the "7/28/14 Compensation Committee Meeting"). HAIN-0000347-350. As Defendant Berke reported, the purpose of the 7/28/14 Compensation Committee Meeting (which was not produced by the Company in response to Plaintiff's 220 Request) was to discuss ████████████████████████████████████████ ████████████████████████ The Compensation Committee evaluated awarding Defendant Simon ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ *Id.* at HAIN-0000350 (emphasis added). As part of this evaluation, Defendant Berke reported that the Compensation Committee had reviewed and considered ████████████████████

207.     Next, Defendant Berke reported on the meeting of the Compensation Committee that occurred earlier on August 13, 2014, noting that the Compensation Committee had continued its discussion regarding ███████████████████████████████████████████ ██████████████████████████ *See id*; *see also* HAIN-0000510 (Minutes from 8/13/14 Compensation Committee Meeting).

208.     On September 11, 2014, the Compensation Committee, including Defendants Berke & O'Neil, and attended also by Defendant Simon, met and discussed, *inter alia*, the peer group analysis ██████████████ as part of its "2015 Executive Compensation Analysis" (*see* HAIN-0000558-583) and resolved to use ███████████████ for its evaluation of executive compensation for 2015.  HAIN-0000511-515.

209.     On September 23, 2014, the entire Board, including Defendants Simon, Berke, Heyer, Meltzer, O'Neil and Zilavy, met and discussed, *inter alia*, the reports from the Compensation Committee's meetings on September 11 and 22, 2014.  HAIN-0000327-336.  In particular, the Board heard a report from Defendant Berke regarding, among other things: (1) the peer group analysis ████████████████ from fiscal year 2015; (2) the Company's achievement of both the 2014 annual performance goals and the 2013-2014 long-term performance goals; (3) the performance of the executive officers and achievement of the revenue and EBITA performance goals for the 2013-2014 Long Term Incentive Plan (the "2013-2014 LTIP"); (4) █████████████████████████████████████████████████████ █████████ and (5) the 2015-2019 Executive Incentive Plan.  *See id*. at HAIN-0000334-335.

210.     On June 25, 2015, the Compensation Committee met and discussed, *inter alia*, various executive compensation matters and a special bonus for one of the Company's executives.  HAIN-0000489-491.  According to documents obtained by Plaintiff from his 220

Request, the Compensation Committee Board also heard reports from Executive Vice President, General Counsel, Chief Compliance Officer and Corporate Security Denise Faltischek ("Faltischek") on the following topics, among others: ███████████████████████████ ████████████████████████████ (*see* HAIN-0000492); the Compensation Committee's charter review and self-evaluation; executive compensation planning and timeline. The details of these discussions were redacted for privilege by Defendants. *Id.* Additionally, the minutes from this meeting indicate that the Compensation Committee met in an executive session, but there is no detail as to what was discussed during that executive session.

211.    On September 10, 2015, the Compensation Committee, consisting of Defendants O'Neil, Berke and Shapira met and, with Defendant Simon in attendance, discussed, *inter alia*, the draft Compensation Committee Report to be included in the 2015 Proxy Statement, the peer group analysis ████████████████ as part of its "2015 Executive Compensation Analysis," and various executive compensation matters. HAIN-0000914-916. According to documents obtained by Plaintiff from his 220 Request, the Compensation Committee also heard reports from Faltischek on the following topics, among others: an executive compensation update; annual cash incentive plans for fiscal year 2015; the achievement of certain metrics under the 2014-2015 LTIP; approval of the target for fiscal year 2016 annual incentive plans; and approval of target for the 2016-2017 Long Term Investment Plan. *Id.* Additionally, the minutes from this meeting indicate that the Compensation Committee met in an executive session, but there is no detail as to what was discussed during that executive session. *Id.* at HAIN-0000916.

212.    On September 30, 2015, the Compensation Committee, consisting of Defendants Berke, O'Neil and Shapira, met with Simon attending, and discussed, *inter alia*, the peer group analysis ████████████████ as part of its "2015 Executive Compensation Analysis,"

incentive awards for 2015, and the 2014-2015 LTIP (HAIN-0000750-60). *See* HAIN-0000912-913. In particular, the Compensation Committee reviewed ████████████████████ ██████████████████████ During its discussion of the peer group analysis, the Compensation Committee noted that █████████████████████████████████ ███████████████████████████████████████████ *Id*. at HAIN-0000912.

213. Additionally, the minutes from this meeting indicate that the Compensation Committee met in an executive session, but there is no detail as to what was discussed during that executive session. *Id.* at HAIN-0000913.

214. On November 19, 2015, the entire Board, consisting of Defendants Heyer, Shapira, Simon, Zilavy, Berke, O'Neil, Kelly and Meltzer, met and discussed, *inter alia*, the report from the Compensation Committee's meeting on September 30, 2015 (which appears to be erroneously designated as October 30, 2015). HAIN-0000744-749. In particular, the Board heard that the Compensation Committee had reviewed ████████████████████ ████████████████ in the context of designing the Company's Long Term Incentive Plan.

215. On June 23, 2016, the entire Board, consisting of Defendants Heyer, Shapira, Simon, Zilavy, Berke, O'Neil, Kelly and Meltzer, met and discussed, *inter alia*, the report from the Compensation Committee's meeting earlier that day. HAIN-0000281-286. In particular, Defendant O'Neil reported that the Compensation Committee had discussed the peer group adopted for 2016 and determined that ████████████████████████████████ ███████████████████████████████████████████ ████ *Id.* at HAIN-0000281.

**3.      Defendant Simon Was Incentivized to Overstate the Company's Revenue So that He Could Receive Millions in Bonuses**

216.   Defendant Simon was paid many millions of dollars over the past several years as President and CEO of Hain.  The way this was accomplished was two-fold: (1) as discussed above, the Board members needed to justify the executive compensation plan itself and attempted to do so by comparing it to the executive compensation plans of much larger and more lucrative companies in order to claim that the Company's executive compensation plan was in line with its "peers"; and (2) once the amount of compensation was determined, the Board via the Compensation Committee needed to devise various performance measures or goals that an executive (or the Company as a whole) must achieve before receiving said compensation.

217.   The Compensation Committee and Board as a whole met many times over the course of the Relevant Period to discuss compensation policies, set performance goals, and award compensation and bonuses to the Company's executives, including Defendant Simon.

218.   For example, on April 16, 2014, the members of the Compensation Committee met and discussed matters involving ████████████████████████████ HAIN-0000182-183.  According to its website, ██████████████████████████████████████ ████████████████████████████

219.   During the meeting, the Compensation Committee reviewed a presentation titled ██████████████████ and had been previously circulated to the Compensation Committee.  HAIN-0000060-74.  ████████████████████████████████████████████ ████████████████████████████████████  With respect to its executive pay evaluation, ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████

220.     As for "Say on Pay Proposals" (*i.e.*, executive compensation proposals, like those found in the Company's 2013-2015 Proxy Statements, from management that must be voted on by shareholders), ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████ HAIN-0000064.

221.     Similarly, the ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████ HAIN-0000065.

222.     The Compensation Committee also reviewed ████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████

223.     Later that same day, April 16, 2014, the entire Board met.  During the "Executive Session" of the Board meeting, two items were discussed.  First, the Board discussed a report that Defendant Simon had achieved one of his performance goals and, as a result, the Board was required to certify as much.  The Board did so and approved the grant to Defendant Simon of "100,000 of the earned Shares [that] will vest in five equal installments over a five-year period commencing on the first anniversary of December 13, 2013."  HAIN-0000103-105.

224.     Next, the Board received the Compensation Committee report from Defendant Berke regarding the Compensation Committee's meeting earlier that day.  Among other things,

Defendant Berke reported on the policies concerning executive compensation and ███████ ██████████████████████████████ *Id.* at HAIN-0000105.

225.　On June 18, 2014, the entire Board, including Berke, Heyer, Meltzer, O'Neil, Zilavy and Simon, met and discussed, *inter alia*, the report from the Compensation Committee's meeting earlier that day.  HAIN-0000096-102.  Defendant Berke reported that the Compensation Committee had reviewed ██████████████ and used it as a "framework" for its analysis of the Company's executive compensation.  The Compensation Committee "concluded that the Company's executive compensation policies and practices do not encourage or create risks that are reasonably likely to have a material adverse effect on the Company."  *Id.* at HAIN-0000099.

226.　Defendant Berke also reported that, in accordance with its charter, the Compensation Committee had conducted an evaluation of its performance for the past fiscal year.  *Id.* at HAIN-0000100.  In connection with that evaluation, the Compensation Committee created a ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ HAIN-0000192-197.

227.　████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████ *Id.* at HAIN-0000192. Despite the obvious suggestion that such an evaluation should be conducted more frequently, the Compensation Committee did the bare minimum.

228.　On August 13, 2014, the entire Board, including Berke, Heyer, Meltzer, O'Neil, Zilavy and Simon, met and discussed, *inter alia*, the report from the Compensation Committee's

meeting on July 28, 2014 (the "7/28/14 Compensation Committee Meeting"). HAIN-0000347-350. As Defendant Berke reported, the purpose of the 7/28/14 Compensation Committee Meeting (which minutes were not included in the 220 production) was to discuss ███████

████████████████████████████████████████████████████████████████████████████

The Compensation Committee evaluated awarding Defendant Simon ████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████ *Id.* at HAIN-0000350. As part of this evaluation, Defendant Berke reported that the Compensation Committee had reviewed and considered the ██████

████

229.    Next, Defendant Berke reported on the meeting of the Compensation Committee that occurred earlier on August 13, 2014, noting that the Compensation Committee had continued its discussion regarding certain strategies for the retention and the continued incentivization of Defendant Simon. *See id.*; *see also* HAIN-0000510 (Minutes from 8/13/14 Compensation Committee Meeting).

230.    On September 11, 2014, the Compensation Committee met and discussed, *inter alia*, the number of shares available in each of the Company's equity plans and an "Equity Plan Proposal" ██████████████████████ regarding the Company's Amended and Restated 2002 Long Term Incentive and Stock Awards Plan (the "2002 Plan"). HAIN-0000511-515.

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

231.     On September 22, 2014, the Compensation Committee met and discussed, *inter alia*, executive compensation for 2014 and a draft amendment to Defendant Simon's employment agreement.  HAIN-0000498-500.

232.     The Compensation Committee concluded that various financial and non-financial goals had been achieved during fiscal year 2014 and awarded approximately $6 million in cash incentives to the Company's executives.  Defendant Simon alone was awarded $4,160,000.  *Id.* at  HAIN-0000498.    Additionally,  the  Compensation  Committee  determined  that  these achievements also warranted a discretionary bonus for those same executives totaling $715,000, of which Defendant Simon received $400,000.  *Id.* at HAIN-0000499.

233.     On November 20, 2014, the Compensation Committee met and discussed, *inter alia*, the Fiscal Year 2015 Annual Cash Incentive Plans for Executive Officers; the 2015-2016 Long  Term  Incentive  Plan  (the  "2015-2016  LTIP");  and  the  non-employee  director compensation for 2015.  HAIN-0000483-488.

234.     That same day, the independent members of the Board consisting of Defendants Berke, Shapira, Heyer, Meltzer, O'Neil and Zilavy, and the now deceased Futterman, met and discussed, *inter alia*, the reports from the Compensation Committee's earlier meeting.  HAIN-0000319-26.  After receiving the various reports, the Board approved each and every proposal on executive compensation that was up for approval.

235.     In addition, according to documents obtained by Plaintiff from his 220 Request, the Board heard a report from Faltischek, who served as the Company's General Counsel, Chief

Compliance Officer, and Secretary at that time, concerning a ███████████ ███████████████████████████████████████ *See id*. at HAIN-0000325. The details of this discussion were redacted for privilege by Defendants.

236. On March 12, 2015, the Compensation Committee met and discussed, *inter alia*, executive compensation and ████████████████████████████ ██████████ HAIN-0000493-494. According to documents obtained by Plaintiff from his 220 Request, the Compensation Committee also heard reports from Faltischek on the following topics: a review of the Company's compensation philosophy (*see* HAIN-0000439-447); the ████████████████████████████████ (*see* HAIN-0000448-482); and stockholder outreach. The details of these discussions were redacted for privilege by Defendants.

237. On September 30, 2015, the Compensation Committee met, discussed, and determined, *inter alia*, that various financial and non-financial performance goals had been achieved during fiscal year 2015 and, as a result, granted the Company's executives approximately $6.7 million in incentive awards. Defendant Simon raked in $5,565,725 of that award. *Id*. at HAIN-0000913.

238. The Compensation Committee, again based on its review of ████████ ██████████████████████ further recommended that each non-employee director receive 4,130 shares of stock and $53,000 in cash as compensation. *Id*. at HAIN-0000744-749 at 747.

239. On November 19, 2015, the entire Board met and discussed, *inter alia*, the report from the Compensation Committee's September 30, 2015 meeting that was incorrectly noted as an October 30, 2015 meeting. HAIN-0000744-749. In particular, Defendant O'Neil reported to

the Board that the Compensation Committee had approved the annual cash incentive plans for 2016 and the proposed compensation for non-employee directors.  HAIN-0000747.

240.    On March 3, 2016, the Compensation Committee met and discussed, *inter alia*, the Company's compensation philosophy, stockholder outreach feedback, and employee grants. The details of this discussion were redacted for privilege by Defendants.

241.    On March 3, 2016, the entire Board met and discussed, *inter alia*, the report from the Compensation Committee's meeting earlier that day.  HAIN-0000301-305.

242.    In particular, Defendant O'Neil reported that the Compensation Committee had reviewed Hain's Compensation Philosphy (HAIN-0000968-976), as disclosed in the 2015 Proxy Statement.  HAIN-0000301.

243.    Defendant O'Neil also reported that the Compensation Committee had reviewed feedback it had received from stockholders during the Company's stockholder outreach efforts both before and during Hain's proxy solicitation.  *Id.*  According to documents obtained by Plaintiff from his 220 Request, this appears to be the same stockholder outreach discussion that Defendants have redacted for privilege.  *Compare* HAIN-0000301-305 *with* HAIN-0000493-494.

244.    Additionally, the minutes from this meeting indicate that Executive Vice President, General Counsel, Chief Compliance Officer and Corporate Security Faltischek also presented during the report of the Compensation Committee, but her discussions have been redacted for privilege in their entirety.  HAIN-0000301-303.

245.    On June 23, 2016, the Board, consisting of all director Defendants, met and discussed, *inter alia*, the report from the Compensation Committee's meeting earlier that day. HAIN-0000281-286.    The Defendants did not provide any minutes from the 6/23/16

Compensation Committee meeting. In particular, Defendant O'Neil reported that the Compensation Committee had reviewed its charter, conducted an evaluation of its performance for fiscal year 2016, and discussed executive compensation planning and the timeline for the upcoming proxy season. *Id.* at HAIN-0000282.

246. As the documents obtained by Plaintiff from his 220 Request show, Defendant Simon's executive compensation was generally determined ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████

247. Recognizing the danger for investors with such an incentive, Brian Stoffel reported in an article titled, "Accounting Issues Aside, Hain Celestial Group Wasn't Built For Buy and Hold Investors," published online by *The Motley Fool* on March 7, 2017,[13] how Defendant Simon was not aligned with the interests of the Company's stockholders and was reaping excessive compensation packages as a result of his achieving various "growth goals."

248. In particular, *The Motley Fool* article stated as follows:

> At its core, Simon was compensated for continually meeting (often year-over-year) growth goals for:
>
> 1. Overall revenue
> 2. Overall earnings per share
> 3. Adjusted EBITDA
>
> On the face of it, there's nothing wrong with these metrics. In fact, they're pretty solid. There's one problem, though: They are awful guidelines for a company like Hain Celestial.

---

[13] *See* www.fool.com/investing/2017/03/07/accounting-issues-aside-hain-celestial-group-wasnt.aspx (last visited May 9, 2017).

That's because Hain has become a leader in natural/organic foods and personal care products by becoming a serial acquirer.

The company has rolled up hundreds of smaller brand names that have made a name for themselves independently. By acquiring them, the thinking goes, Hain can inject the money and scale necessary to take them to the next level.

Except, that may not be what's happening at all. One 2015 review on Glassdoor.com stated: "Hain's current acquisition model essentially operates on limiting up-front costs ... they slim down an acquired brand's team to the bare minimum."

\* \* \*

[I]t appears Hain's management was incentivized to squeeze out short-term profit from its brands while possibly not investing the requisite amount in their long-term success. . . .

249. But, as *The Motley Fool* article rightly concludes:

***This opens up the door for an alarming possibility: Hain could have been continually buying up smaller players because management knew it would have an immediately positive impact on revenue***. Then, by cutting the acquired brand's operations down to the bare bones, it could eek out greater profitability.

250. Defendant Simon's incentive for engaging in this sort of revenue growth sleight of hand is simple: he gets paid huge sums of money for meeting performance goals relating to revenue growth. He can increase revenue by either growing the business organically, or aggressively acquiring companies and taking their revenue onto the Company's financial statements without doing the necessary due diligence to ensure the revenue recognition policies of the acquired companies are integrated into the Company's, and disregard payouts to distributors that reduce the timing, and quite possibly amount of revenue. Defendant Simon, as CEO of the Company, has chosen the latter growth method in order to continue to reap his massive compensation and bonus awards.

### 4. Hain's Shareholders Have Tried Futilely for Years to Rein in Executive Compensation, But to No Avail

251.    For at least six years the Company's shareholders repeatedly voiced their concern with the compensation practices approved by the Compensation Committee and Board.  And for six years the Board has turned a deaf ear to their concerns.

**2011 Proxy Statement and Related Shareholder Vote on Pay**

252.    On October 7, 2011, the Company filed a Schedule 14A with the SEC (the "2011 Proxy Statement"), which presented Hain's shareholders with various proposals relating to, *inter alia*, executive compensation.

253.    According to the Company's Form 8-K, filed with the SEC on November 18, 2011 (the 11/18/11 Press Release"), under "Proposal No. 2 – Advisory Vote regarding the Compensation of the Company's Named Executive Officers" of the 2011 Proxy Statement approximately 41% of the Company's stockholders voted against the proposed compensation awarded to, among others, Defendant Simon.

254.    Proposal No. 3 of the 2011 Proxy Statement was titled "Advisory Vote Regarding the Frequency of Advisory Votes on Executive Compensation."  But stockholders saw through that attempt by the Board to avoid annual scrutiny of executive compensation and overwhelmingly (90%) voted in favor of a yearly vote.

255.    As a further rejection of the Company's wasteful spending, the 11/18/11 Press Release shows that, under "Proposal No. 4 – Approval of the Amendment of the Amended and Restated 2002 Long Term Incentive and Stock Award Plan" of the 2011 Proxy Statement, approximately one-quarter of stockholders voted against the increases in compensation awarded to the Board and management under the Company's bonus and stock award plans.

**2012 Proxy Statement and Shareholder Voting on Pay**

256.     On October 5, 2012, the Company filed a Schedule 14A with the SEC (the "2012 Proxy Statement"), which presented Hain's shareholders with various proposals relating to, *inter alia*, executive compensation.

257.     According to the Company's Form 8-K/A, filed with the SEC on November 21, 2012 (the 11/21/12 Press Release"), under "Proposal No. 2 – Advisory Vote regarding the Compensation of the Company's Named Executive Officers" of the 2012 Proxy Statement, approximately 31% of the Company's stockholders voted against the proposed compensation awarded to, among others, Defendant Simon.

258.     As a further rejection of the Company's wasteful spending, the 11/21/12 Press Release shows, under "Proposal No. 3 – Approval of the Amendment of the Amended and Restated 2002 Long Term Incentive and Stock Award Plan" of the 2012 Proxy Statement, over one-quarter of stockholders voted against the increases in compensation awarded to the Board and management under the Company's bonus and stock award plans.

**2013 Proxy Statement and Shareholder Voting on Pay**

259.     On October 10, 2013, the Company filed a Schedule 14A with the SEC (the "2013 Proxy Statement"), which presented Hain's shareholders with various proposals relating to, *inter alia*, executive compensation.

260.     According to the 11/22/13 Form 8-K, under "Proposal No. 2 – Advisory Vote regarding the Compensation of the Company's Named Executive Officers" of the 2013 Proxy Statement, approximately 41% of the Company's stockholders voted against the proposed compensation awarded to, among others, Defendant Simon.

**2014 Proxy Statement and Related Shareholder Vote on Pay**

261. The 2014 Proxy Statement presented Hain's shareholders with various proposals relating to, *inter alia*, executive compensation.

262. Frustrated that their previous disapproval of the executive compensation plan went unheeded, the Company's shareholders attempted to oust the members of the Compensation Committee. According to the Company's Form 8-K, filed with the SEC on November 26, 2014 (the 11/26/14 Press Release"), under "Proposal No. 1 – Election of Directors" of the 2014 Proxy Statement approximately one-third of the Company's stockholders withheld their votes from the members of the Compensation Committee: Defendant Berke (13,731,431 votes), Defendant Futterman (13,195,001 votes), and Defendant O'Neil (12,748,052 votes).

263. In addition, the 11/26/14 Press Release shows that, under "Proposal No. 5 – Advisory Vote regarding the Compensation of the Company's Named Executive Officers" of the 2014 Proxy Statement, the percentage of stockholders who voted against the proposed compensation awarded to, among others, Defendant Simon, increased to approximately 49.1%.

**2015 Proxy Statement and Related Shareholder Vote on Pay**

264. The 2015 Proxy Statement presented Hain's shareholders with various proposals relating to, *inter alia*, executive compensation.

265. Once again, disgusted stockholders sought to remove the Compensation Committee Members from the Board. According to the Company's Form 8-K, filed with the SEC on November 25, 2015 (the "11/25/15 Press Release"), under the title "Proposal No. 1 – Election of Directors" of the 2015 Proxy Statement, over one-third of the Company's

stockholders withheld their votes from Defendant Berke (27,139,780 votes), Defendant O'Neil (27,980,614 votes), and Defendant Shapira (27,081,071).

266. In addition, under "Proposal No. 2 – Advisory Vote regarding the Compensation of the Company's Named Executive Officers" of the 2015 Proxy Statement approximately 59.1% of the Company's shareholders voted against the proposed compensation awarded to, among others, Defendant Simon.

267. On March 3, 2016, the Board, consisting of all director Defendants, held a meeting to discuss, among other things, the report of the Compensation Committee. According to that report, "[t]he Committee also reviewed the feedback received from stockholders during the Company's stockholder outreach efforts both before and during the Company's proxy solicitation in order to gain a better understanding of any concerns stockholders may have."

268. The media recognized, even if the Board did not, the significance of the Hain stockholders' votes. For example, the Bloated Pay Article discussed the accounting problems mentioned above and criticized the Company for its exorbitant executive compensation practices.

269. The Bloated Play Article analyzed the stockholder voting trends from the Company's 2012 to 2015 Proxy Statements and observed that "many of Hain's shareholders have expressed their displeasure with the compensation, voting in nonbinding resolutions against the company's pay practices in higher numbers with each passing year." According to the Bloated Pay Article, the increase to 59% of the Company's shareholders voting "no" on proposals involving Hain's executive compensation was "staggering" and "is a striking contrast to the 5 percent median nay vote tallied at all 500 companies in the Standard & Poor's index [in 2016]."

270.     The Bloated Pay Article also discussed the decreased likelihood that the

Company's relationship with its stockholders would improve, remarking that the Board's failures

to heed the stockholders' dissent on executive compensation along with the accounting

wrongdoing alleged herein, may cause stockholders "anger [to] boil over at its as-yet-

unscheduled annual meeting this fall."  As the Bloated Pay Article observed:

> At last year's meeting in November [2015], more than one-third of the votes cast withheld support for the three directors.  ***That kind of dissent is rare in the boardroom.***
>
> Through the Hain spokeswoman, the directors declined to comment.
>
> ***Hain characterizes itself in its filings as a leader in corporate governance that has "consistently demonstrated our longstanding willingness to listen and respond to our stockholders' concerns." Really?***
>
> ***Shareholders of United States companies are a pretty easygoing bunch most of the time.  It typically takes a lot to get them agitated.  But when they do protest, corporate board members should know better than to ignore them.***

[Emphasis added].

271.     Similarly, in a blog post titled "Excessive compensation and accounting

misstatements at an organic food company," published by Cengage Learning, Inc. on August 24,

2016,[14] the Company's compensation and accounting practices were sharply criticized as

follows:

> Hain Celestial, the makers of Rudi's whole wheat bread and Greek Gods yogurt, has trademarked the phrase, "A Healthier Way of Life since 1993."  ***Its behavior in terms of executive compensation and accounting practices, however, have not been healthy for the company.  Paying an executive an exorbitantly high salary is not a "healthy way of life" if stockholders object (and they have).   Not following the GAAP accounting rules in order to overstate corporate income is not healthy for stockholders or potential investors.  This has been the pattern for***

---

[14]     *See*  community.cengage.com/GECResource2/info/b/business/archive/2016/08/23/excessive-compensation-and-accounting-misstatements-at-organic-food-company (last visited on May 9, 2017).

***Hain Celestial for several years.*** Stockholders have voiced objections to the exorbitant pay--particularly for Irwin D. Simon (President, CEO and Chairman of the board). His salary averages $18.1 million per year, which is much higher than executive salaries for other companies of the same size.

The recent loss of $1.5 billion in market capitalization--an investor reaction to the recently disclosed accounting error--makes the salary even more out-of-line.

[Emphasis added].

**5.     2015 Proxy Statement Is False and Violates §14(a) of the Exchange Act**

272.    The 2015 Proxy, *inter alia*, solicited shareholder votes to re-elect Defendants Simon, Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira and Zilavy, who constitute all the director Defendants. Defendants issued materially misleading statements with respect to these solicited votes and, as such, violated §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78n(a)).

273.    In support of re-electing Defendants Simon, Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, and Zivay, the 2015 Proxy falsely claimed that: (i) Hain Celestial's financial statements were accurate, and therefore appropriate for the Board's approval in the Company's annual report; (ii) the Audit Committee exercised oversight of the Company's financial statements; and (iii) the Board was overseeing the Company, including focusing on the risk in the Company's operations and finances. In particular, the 2015 Proxy stated:

**Board's Role in Risk Oversight**

Management is responsible for the Company's day-to-day risk management and ***the Board's role is to engage in informed oversight of, and provide direction with respect to, such risk management.*** In its oversight role regarding risk management, the Board focuses on understanding the nature of our enterprise risks, including risk in our operations, finances and the strategic direction of the Company and reviews and approves the Company's Annual Operating Plan. The Annual Operating Plan addresses, among other things, the risks and opportunities facing the Company. The Board receives regular updates regarding the Company's progress against its Annual Operating Plan and reviews quarterly

updates regarding the related risks and opportunities. ***The Board maintains control over significant transactions and decisions that require Board approval for certain corporate actions (including material acquisitions or divestitures).***

The Board has delegated certain risk management oversight responsibilities to the Audit Committee and the Compensation Committee.

***As part of its responsibilities as set forth in its charter, the Audit Committee is responsible for discussing with management the Company's policies and guidelines regarding risk assessment and risk management as well as the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures.***

***

### The Audit Committee

***The Audit Committee's principal duties include*** appointing, retaining and terminating our registered independent accountants, overseeing the work of and evaluating the independence of the registered independent accountants, reviewing with the registered independent accountants their reports ***as well as oversight responsibilities with respect to our financial statements, disclosure practices, accounting policies, procedures and internal controls.***

***

In addition to fulfilling its responsibilities as set forth in its charter and further described above in "Board of Directors and Corporate Governance – Committees of the Board – The Audit Committee," ***the Audit Committee has reviewed the Company's audited financial statements for fiscal year 2015.*** Discussions about the Company's audited financial statements included its independent registered public accounting firm's judgments about the quality, not just the acceptability, of the Company's accounting principles and underlying estimates used in its financial statements, as well as other matters, as required under Public Company Accounting Oversight Board Auditing Standard No. 16, *Communications with Audit Committees* ("**AS 16**") and by our Audit Committee Charter. ***In conjunction with the specific activities performed by the Audit Committee in its oversight role, it issued the following report***:

1. ***The Audit Committee has reviewed and discussed the audited financial statements as of and for the year ended June 30, 2015 with the Company's management***.

2. The Audit Committee has discussed with the independent registered public accounting firm the matters required to be discussed by AS 16.

**3.** The Audit Committee has received from the independent registered public accounting firm the written disclosures and the letter required by applicable requirements of the Public Company Accounting Oversight Board regarding the independent registered public accounting firm communications with the Audit Committee concerning independence, and the Audit Committee has discussed with the independent registered public accounting firm their independence from the Company.

Based on the reviews and discussions referred to in paragraphs (1) through (3) above, the ***Audit Committee recommended to the Board of Directors, and the Board of Directors has approved, that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2015 for filing with the SEC.***

[Emphasis added].

274.    The statements described above are both false and material. The Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements. The Company was not correctly recognizing for its revenue and, therefore, its financial statements were not accurate. Defendants Simon, Berke, Heyer, Kelly, Meltzer, O'Neil, Shapira, and Zilavy were negligent in making these misleading statements in the 2015 Proxy.

**Summary of Defendants' Wrongful Conduct**

275.    In breach of their fiduciary duty of loyalty, the Individual Defendants knowingly or consciously failed to maintain effective internal accounting controls, which, in turn, caused the Company to overstate its revenue and disseminate false and misleading information about the Company's operations and financial health.

276.    Because of these failures, the Individual Defendants were able to take advantage of various compensation awards that were contingent on, *inter alia*, the performance of goals regarding growth of the Company's revenue.

277. Moreover, the Individual Defendants' compensation awards were not justified in light of their failure to comply with GAAP's reporting standards, timely disclose the materially misleading statements and information in the Company's reported financial results, and protect the Company's assets from corporate waste.

278. This unjust enrichment at the expense of Hain renders the Individual Defendants liable to the Company.

279. Also in breach of their fiduciary duties, the Individual Defendants have incurred millions of dollars of legal liability and associated litigation costs, paid improper compensation and bonuses to certain executive officers and directors that breached their fiduciary duties; and overpaid for Hain's own stock during the portion of the Relevant Period that at least included the period from October 1, 2015 to March 31, 2016 while the stock price was artificially inflated.

280. This waste of corporate assets makes the Individual Defendants each liable to the Company.

## I. DAMAGES TO HAIN

281. As a direct and proximate result of the Individual Defendants' wrongdoing, Hain suffered, and will continue to suffer, a host of damages.

282. These damages include, among other things:

a) damage to Hain's reputation and good will (including perhaps irreparable damage to the Company's reputation and credibility with insurers and securities regulators, and to Hain's reputation and credibility in the business, insurance, and financial communities);

b) a huge loss in market value and stockholder equity;

c) the costs of internal investigations, including the costs of investigations conducted by outside auditors and outside counsel;

d) the legal fees, costs, and amounts payable in settlement or satisfaction of the Securities Fraud Class Actions filed against the Company and Defendants Simon and Conte and the Consumer Class Action filed against the Company;

e) the compensation, bonuses, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company;

f) the money that the Company overpaid for its own stock from October 1, 2015 to March 31, 2016 and during the rest of the Relevant Period (approximately $22.4 million) while the stock price was artificially inflated due to the false and misleading statements and omissions that the Individual Defendants made and/or caused the Company to make;

g) the inability to obtain credit from lenders, or the decrease in the amount of credit previously offered, due to the Company's repeated breaches of its Credit Agreements for failure to timely provide the Company's audited financial results;

h) the losses caused by the non-compliance with NASDAQ rules and potential delisting from the NASDAQ.

283. The Company has been directly and substantially injured by reason of the Individual Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiff, as a stockholder and representative of Hain, seeks damages and other relief for the Company, in an amount to be proven at trial.

## J.    DERIVATIVE AND DEMAND ALLEGATIONS

284. Plaintiff brings this action derivatively in the right and for the benefit of Hain to redress injuries suffered, and to be suffered, by Hain as a direct result of breaches of the fiduciary duties of loyalty and due care by the Individual Defendants. Hain is named as a Nominal Defendant solely in a derivative capacity.

285.    Plaintiff will adequately and fairly represent the interests of Hain in enforcing and prosecuting its rights.

286.    Plaintiff was a stockholder of Hain at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Hain stockholder.

287.    The current Board of Hain consists of the following eight individual Defendants: Defendants Simon, Heyer, Shapira, Zilavy, Berke, O'Neil, Kelly, and Meltzer.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be futile, since a majority of the Board lacks the requisite independence or disinterest to fairly decide a demand.

288.    The severity of the internal reporting and control deficiencies at the Company has resulted in the Company being (1) continually unable to file its audited financial results for three consecutive quarters; (2) subject to delisting by NASDAQ; and (3) faced with a default with lenders.  This, plus the Board's mandate to review and set Company policy, particularly with respect to the Corporate Guidelines and Code of Conduct, and the fact that sales to distributors, and the revenue derived therefrom, were a significant source of the Company's bottom line, the obvious falsehoods of the assurances from Defendants that there was no wrongdoing by the Company (*supra* at ¶144), and that total revenue would not be affected by the accounting impropriety (*supra* at ¶119) despite the fact that the audit was incomplete, supports the reasonable inference that the Individual Directors were aware that the Company's financial results were being misreported.

289.    Further, Documents obtained by Plaintiff through the 220 Request reveal that the Individual Defendants knew that the Company had a long history of being plagued by various internal control deficiencies.  *See, e.g*., HAIN-0000103-105 (4/16/14 Board minutes discussing

███████████████████████████████████ HAIN-0000001-10
(5/5/14 Audit Committee Presentation discussing ██████████; HAIN-0000429-430
(8/26/2014 Audit Committee Minutes discussing as part of ████████████████████
████████████████████████████████████████████████████████████
HAIN-0000357 (5/4/15 Audit Committee Presentation summarizing ████████████████
█████████████████████████; HAIN-0000281-286 (6/23/16 Board Minutes
discussing Audit Committee Reports concerning ██████████████████. Thus, good-
faith Board members, particularly those serving on the Audit Committee, Heyer, Shapira, and
Zilavy, would have been hyper aware of the need to maintain effective internal controls for the
Company's financial reporting.

290. Moreover, despite knowing that distributors accounted for a significant
percentage of the Company's business, and that any concessions given to those distributors
would have a material impact on the Company's revenues, the Individual Defendants recklessly
approved of the use of a revenue recognition practice that improperly overstated the Company's
revenue. Most importantly, documents obtained by Plaintiff through the 220 Request show that
the Board was expressly informed about █████████████████████████████████
████████████████████████████████████ *See* HAIN-0000281-
286, at 284.

291. Concurrently, the Individual Defendants either knew or intentionally and
consciously failed to address the over-compensation of Defendant Simon and the conflicts of
interest created for him concerning his performance bonuses. The Individual Defendants,
particularly those on the Compensation Committee, O'Neil, Berke, and Shapira, actively
approved the waste of the Company's financial assets by grossly over-compensating Defendant

Simon. This approval was based on an inherently flawed "peer-to-peer" analysis of executive compensation, that the Compensation Committee members knew to be false. Worse, the Board disregarded the express wishes of shareholders who unambiguously voted against such over-compensation of the Company's executives over and over again. *See* 11/18/11 Form 8-K; 11/21/12 Form 8-K/A; 11/22/13 Form 8-K; 11/26/14 Form 8-K; 11/25/15 Form 8-K.

Simon

292. As the Company acknowledges, Defendant Simon is a non-independent director under its own standards, the rules and regulations of the SEC, and NASDAQ Stock Market listing rules, due to his position as Hain's Chief Executive Officer and Chairman of the Board. This alone renders Defendant Simon incapable of considering demand.

293. In addition, Defendant Simon is incapable of considering demand because:

- Defendant Simon is implicated in all of the wrongful conduct described herein, including the fraudulent accounting practices, the Company's operations and internal controls, for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings, all of which he signed, and including many of which he personally made, and the Company's repurchases of its own stock at artificially inflated prices;

- He faces substantial likelihood of liability for the breach of fiduciary duty of loyalty claims asserted herein as well as civil liability in the Securities Fraud and Consumer Class Actions;

- Defendant Simon consciously abandoned his duty to properly oversee and monitor the Company's internal controls over financial reporting and consciously disregarded his duties to protect corporate assets.

## Heyer

294. Defendant Heyer is also incapable of considering a demand because:

- As the Chair of the Audit Committee during the Relevant Period, he was particularly liable for knowingly failing to fulfill oversight responsibilities with respect to the accounting fraud alleged herein;

- He attended meetings of the Audit Committee and entire Board where the misreporting of revenue due to distributor concessions was discussed, and knowingly failed to take appropriate action and disclose the unreliability of the Company's financial statements within the four-day time period proscribed by the SEC in its Rule 8 disclosure requirement;

- He consciously abandoned his duty to properly oversee and monitor the Company's internal controls over financial reporting and consciously disregarded his duties to protect corporate assets;

- As a member of the Board during the entire Relevant Period, Defendant Heyer knew from the reports of the Compensation Committee and the shareholder reactions to the executive pay awarded to co-Defendant Simon, that the pay awarded to Simon was excessive, not in the best interest of the Company, and amounted to waste to the Company and unjust enrichment to co-Defendant Simon.

- He faces a substantial likelihood of liability for the breach of fiduciary duty and Exchange Act claims asserted herein.

## Shapira

295. Defendant Shapira is incapable of considering a demand because:

- She was a member of the Audit Committee during the Relevant Period, and thus was liable for knowingly failing to fulfill oversight responsibilities with respect to the accounting fraud alleged herein;

- She attended meetings of the Audit Committee and entire Board where the misreporting of revenue due to distributor concessions was discussed, and knowingly failed to take appropriate action and disclose the unreliability of the Company's financial statements within the four-day time period proscribed by the SEC in its Rule 8 disclosure requirement;

- She consciously abandoned her duty to properly oversee and monitor the Company's internal controls over financial reporting and consciously disregarded her duties to protect corporate assets.

- She is a member of the Compensation Committee, which is directly responsible for setting and approving the CEO's and CFO's performance goals and associated bonuses, and she knew from Compensation Committee meetings and shareholder reactions to the executive pay awarded to co-Defendant Simon, that the pay awarded to Simon was excessive, not in the best interest of the Company, and amounted to waste to the Company and unjust enrichment to co-Defendant Simon;

- She faces a substantial likelihood of liability for the breach of fiduciary duty and Exchange Act claims asserted herein.

<u>Zilavy</u>

296.    Defendant Zilavy is incapable of considering demand because:

- He was a member of the Audit Committee during the Relevant Period, and thus was particularly liable for failing to fulfill oversight responsibilities with respect to the accounting fraud alleged herein;

- He attended meetings of the Audit Committee and entire Board where the misreporting of revenue due to distributor concessions was discussed, and knowingly failed to take appropriate action and disclose the unreliability of the Company's financial statements within the time proscribed by the SEC;

- He abandoned his duty to properly oversee and monitor the Company's internal controls over financial reporting and consciously disregarded his duties to protect corporate assets;

- He is the Chair of the Corporate Governance and Nominating Committee, which is responsible for overseeing that any applicable corporate governance principles and policies, including the Corporate Guidelines, are adhered to and that the Board and its committees are properly evaluated. His failure to properly do so makes him culpable for the wrongful conduct described herein;

- As a member of the Board during the entire Relevant Period, Defendant Zilavy knew from the reports of the Compensation Committee and the shareholder reactions to the executive pay awarded to co-Defendant Simon, that the pay awarded to Simon was excessive, not in the best interest of the Company, and amounted to waste to the Company and unjust enrichment to co-Defendant Simon.

- He faces a substantial likelihood of liability for the breach of fiduciary duty and Exchange Act claims asserted herein.

297. As noted above, the Audit Committee is primarily responsible for overseeing the Company's financial statements, internal controls, disclosure practices, and accounting policies, and reviewing any reports produced by the registered independent accountants. Defendant Simon, as the CEO of the Company, has all of these same responsibilities. Further, Defendant Simon certifies each quarterly statement is accurate and verifies the effectiveness of the Company's internal controls. Documents obtained by Plaintiff through his 220 Request show that Defendant Simon as CEO and Defendants Heyer, Shapira, and Zilavy as members of the Audit Committee knew of the Company's misreporting of revenue no later than June 10, 2016 but covered it up until August 15, 2016, just prior to the deadline for filing the Company's annual report. *See* HAIN-000279. As this is a clear violation of the SEC's four-day disclosure requirement, these four Directors face a substantial likelihood of liability.

298. With Defendant Simon and the three members of the Audit Committee being incapable of considering demand, demand futility has been established for the entire Board. However, as discussed below, the other members of the Board are also incapable of considering demand.

Berke

- He is a member of the Corporate Governance and Nominating Committee, which is responsible for overseeing that any applicable corporate governance principles and policies, including the Corporate Guidelines, are adhered to and that the Board and its committees are properly evaluated. His failure to properly do so makes him culpable for the wrongful conduct described herein;

- He is a member of the Compensation Committee, which is directly responsible for setting and approving the CEO's and CFO's performance goals and associated

bonuses, and he knew from Compensation Committee meetings and shareholder reactions to the executive pay awarded to co-Defendant Simon, that the pay awarded to Simon was excessive, not in the best interest of the Company, and amounted to waste to the Company and unjust enrichment to co-Defendant Simon;

- He consciously abandoned his duty to properly oversee and monitor the Company's internal controls over financial reporting and consciously disregarded his duties to protect corporate assets;

- He faces a substantial likelihood of liability for the breach of fiduciary duty and Exchange Act claims asserted herein.

O'Neil

299. Defendant O'Neil is incapable of considering demand because:

- He was the Chair of the Compensation Committee during the Relevant Period, and was directly responsible for setting and approving the CEO's and CFO's performance goals and associated bonuses. He knew from Compensation Committee meetings and shareholder reactions to the executive pay awarded to co-Defendant Simon, that the pay awarded to Simon was excessive, not in the best interest of the Company, and amounted to waste to the Company and unjust enrichment to co-Defendant Simon.

- He consciously abandoned his duty to properly oversee and monitor the Company's internal controls over financial reporting and consciously disregarded his duties to protect corporate assets;

- He faces a substantial likelihood of liability for the breach of fiduciary duty and Exchange Act claims asserted herein.

Kelly

300. Defendant Kelly is incapable of considering demand because:

- He is a member of the Corporate Governance and Nominating Committee, which is responsible for overseeing that any applicable corporate governance principles and policies, including the Corporate Guidelines, are adhered to and that the Board and its committees are properly evaluated. His failure to properly do so makes him culpable for the wrongful conduct described herein;

- He consciously abandoned his duty to properly oversee and monitor the Company's internal controls over financial reporting and consciously disregarded his duties to protect corporate assets;

- As a member of the Board during the entire Relevant Period, Defendant Kelly knew from the reports of the Compensation Committee and the shareholder reactions to the executive pay awarded to co-Defendant Simon, that the pay awarded to Simon was excessive, not in the best interest of the Company, and amounted to waste to the Company and unjust enrichment to co-Defendant Simon.

- He faces a substantial likelihood of liability for the breach of fiduciary duty and Exchange Act claims asserted herein.

Meltzer

301. Defendant Meltzer is incapable of considering demand because:

- He is not "independent" in that, outside of his position as a director of Hain, Defendant Meltzer is a partner at the law firm DLA Piper LLP (US), which provides legal services to the Company;

- He consciously abandoned his duty to properly oversee and monitor the Company's internal controls over financial reporting and consciously disregarded his duties to protect corporate assets;

- As a member of the Board during the entire Relevant Period, Defendant Meltzer knew from the reports of the Compensation Committee and the shareholder reactions to the executive pay awarded to co-Defendant Simon, that the pay awarded to Simon was excessive, not in the best interest of the Company, and amounted to waste to the Company and unjust enrichment to co-Defendant Simon.

- He faces a substantial likelihood of liability for the breach of fiduciary duty and Exchange Act claims asserted herein.

302. In addition, each member of the Board is required to be familiar with the Company's Code of Conduct, which requires them to abide by particular standards of business conduct. The Code of Conduct requires all employees, officers and directors to avoid activities or relationships that conflict with the Company's interests or adversely affect the Company's reputation. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

# FIRST CLAIM

## Against the Individual Defendants for Breach of Fiduciary Duties

303. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

304. Each Individual Defendant owed to Hain and its stockholders fiduciary duties of loyalty, which encompassed good faith and candor in managing the Company's affairs.

305. As detailed above, the Individual Defendants breached their fiduciary duties of loyalty and good faith by willfully and/or recklessly:

    a.  failing to ensure that Hain, its directors, and officers complied with federal laws, as well as Hain's Corporate Guidelines and Code of Conduct;

    b.  failing to conduct an adequate investigation of known potential (and/or actual) violations of federal and state laws;

    c.  failing to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting;

    d.  authorizing Hain's public announcements and SEC filings which they knew or recklessly disregarded contained overstated revenue, in violation of GAAP and the federal securities laws and regulations;

    e.  failing to timely disclose the revenue recognition problems within four days of discovering that the Company's results of operations and financial condition had been misreported;

    f.  failing to abide by the reporting requirements in the Company's credit agreements, and, as a result, causing the Company to be in jeopardy of defaulting with its lenders; and

g. causing the Company to repurchase its stock at artificially inflated prices for at least $22.4M during the part of the Relevant Period that at least includes the following period of time, October 1, 2015 to March 31, 2016, due to their misreporting of Hain's financial results.

306. As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Hain has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, the cost of defending the Company against government investigations (like the current SEC investigation) and the penalties, fines and other liabilities and expenses associated with those investigations.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

307. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

308. While under the Individual Defendants' leadership, Hain failed to maintain effective internal accounting controls, which, in turn, caused the Company to overstate its revenue and disseminate false and misleading information about its operations and financial health.

309. The Individual Defendants, however, received millions of dollars in salaries, bonuses, stock, and other payments that were triggered by the performance of various financial goals (*e.g.*, increases in revenue and sales) or by the artificially inflated valuation of Hain stock.

310. Concurrently, Individual Defendants received millions of dollars in salaries, bonuses, stock, and other payments that were not justified because of their failure to comply with GAAP's reporting standards, their failure to timely disclose the materially misleading

statements and information in the Company's reported financial results, and their failure to protect the Company's assets from corporate waste.

311. Accordingly, the Individual Defendants have been unjustly enriched at the expense of Hain and are, therefore, liable to the Company.

312. Plaintiff, as a shareholder and representative of the Company, seeks restitution from these Individual Defendants and an order of this Court disgorging all profits, benefits, and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## THIRD CLAIM

### Against Individual Defendants for Waste of Corporate Assets

313. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

314. As a result of the wrongdoing detailed herein, the Individual Defendants have wasted valuable corporate assets, incurred millions of dollars of legal liability and associated litigation costs, paid improper compensation and bonuses to certain executive officers and directors that breached their fiduciary duties; and overpaid for Hain's own stock during the portion of the Relevant Period that at least included the period from October 1, 2015 to March 31, 2016, while the stock price was artificially inflated.

315. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

## FOURTH CLAIM

### Violation of §14(a) of the Exchange Act

316. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

317. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

318. The Director Defendants, Heyer, Shapira, Simon, Zilavy, Berke, O'Neil, Kelly and Meltzer, exercised control over the Company and caused the Company to disseminate a false and misleading 2015 Proxy. This Proxy materially misrepresented the manner in which nominees for the Company's Board of Directors were selected, and the effectiveness of the Board's oversight of financial issues at the Company.

319. As stated herein, this Proxy contained untrue statements of material facts in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. These false statements and omissions were essential links in the election of the Director Defendants to the Company's Board of Directors and the continued illegal management of the Company.

320. The written communications made by the Defendants described herein constitute violations of Rule 14a-9 and §14(a), because such communications were materially false and/or misleading and were provided in a negligent manner.

321. At all relevant times to the dissemination of the materially false and/or misleading 2015 Proxy, Defendants were aware of and/or had access to the true facts concerning the Company's operations, and Plaintiff had no way of knowing of the falseness of the 2015 Proxy.

322. Hain has been severely injured by this conduct and is entitled to damages and equitable relief.

## FIFTH CLAIM

### Violation of §29(b) of the Exchange Act

323.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

324.    Individual Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §14(a) of the Exchange Act.  The Individual Defendants' incentive compensation and fees should be rescinded under §29 of the Exchange Act because Individual Defendants violated §14 by issuing false and misleading reports to the Company's shareholders.  All of the payments Defendants received are therefore voidable by the Company under §29(b) of the Exchange Act.

325.    The Company is in privity with the Individual Defendants with respect to the incentive compensation and fees provided by the Company to Individual Defendants.  Individual Defendants have engaged in prohibited conduct in violation of the securities laws as alleged herein.

326.    The Company has been severely injured by the misconduct of the Individual Defendants.  Accordingly the Company is entitled to damages, *i.e.*, recession of the incentive and compensation and fees granted to Individual Defendants.

## K.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    declaring that Plaintiff may maintain this derivative action on behalf of Hain and that Plaintiff is a proper and adequate representative of the Company;

B.    declaring that the Individual Defendants have breached their fiduciary duties to Hain and violated the federal securities laws;

C.    determining and awarding to Hain the damages sustained by it, as a result of the

breaches of fiduciary duty set forth above from each of the Individual Defendants, jointly and severally;

D.    awarding to Hain restitution from the Individual Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by them;

E.    directing Hain to take all necessary actions to reform and improve its corporate governance and internal procedures, and comply with all applicable laws and to protect the Company and its stockholders from a recurrence of the damaging events described herein;

F.    awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

G.    awarding pre- and post-judgment interest; and

H.    granting such other and further relief as the Court deems just and equitable.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 23, 2017

Judith S. Scolnick
Thomas L. Laughlin IV
Donald A. Broggi
Sean T. Masson
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jscolnick@scott-scott.com
tlaughlin@scott-scott.com
dbroggi@scott-scott.com
smasson@scott-scott.com

Amber L. Eck
ZELDES HAEGGQUIST & ECK LLP
225 Broadway, Suite 2050
San Diego, CA 92101

89

Telephone: (619) 342-8000
Facsimile (619) 342-7878
ambere@zhlaw.com

*Co-Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GARY MERENSTEIN, derivatively on behalf of THE HAIN CELESTIAL GROUP, INC., | CIVIL ACTION NO. _____ |
| Plaintiff, | |
| v. | |
| ANDREW R. HEYER, ADRIANNE SHAPIRA, IRWIN D. SIMON, PASQUALE ("PAT") CONTE, LAWRENCE S. ZILAVY, RICHARD C. BERKE, SCOTT M. O'NEIL, RAYMOND W. KELLY, AND ROGER MELTZER, | |
| Defendants, | |
| and | |
| THE HAIN CELESTIAL GROUP, INC., | |
| Nominal Defendant. | |

## VERIFICATION AND AFFIDAVIT OF GARY MERENSTEIN

STATE OF _Colorado_ )
COUNTY OF _Boulder_ ) ) ss.:

I, GARY MERENSTEIN, being duly sworn, depose and say:

1.      I am the plaintiff in this action. I hereby declare and verify that I am currently an owner of The Hain Celestial Group Inc. ("Hain") common stock and have continuously been an owner of Hain stock since at least December 2013.

2.     I have read and reviewed the allegations of the Verified Shareholder Derivative Complaint (the "Complaint") in this action and confirm that the facts stated in the Complaint, as they concern my own acts and deeds, are true to my personal knowledge, that the action is not collusive, and that I am capable and willing to fairly and adequately represent the interests of shareholders who are similarly situated in enforcing the rights of the corporation.  I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true and accurate.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed this 17 day of May 2017.

_____
GARY MERENSTEIN

Sworn to and subscribed before me this 17 day of May, 2017.

_____
Notary Public

My Commission Expires:  03/22/2021

TONY SITTHISAY
Notary Public – State of Colorado
Notary ID 20174012598
My Commission Expires Mar 22, 2021

2